Eugene S. HARSH, Lois E. Harsh, Cheryl L. Zwoyer, Co–Administrators for the Estate of Douglas Lee Harsh, deceased; Carol A. Zwoyer, Charles J. Zwoyer, Jr., Cheryl L. Zwoyer, Co–Administrators for the Estate of Connie J. Harsh, deceased; and Cheryl L. Zwoyer, Adminstratrix for the Estate of Tyler D. Harsh, deceased,

v.

Frederick W. PETROLL and HAC Farm Lines Agricultural Cooperative Association and Cyned (a/k/a Sined) Transport Corporation and Pennsylvania Department of Transportation and General Motors Corporation and Chevrolet Motor Division, General Motors Corporation and Jim McKay Chevrolet, Inc.

Appeal of General Motors Corporation.

Eugene S. Harsh, Lois E. Harsh, Cheryl L. Zwoyer, Co–Administrators for the Estate of Douglas Lee Harsh, deceased; Carol A. Zwoyer, Charles J. Zwoyer, Jr., Cheryl L. Zwoyer, Co–Administrators for the Estate of Con-

nie J. Harsh, deceased; and Cheryl L. Zwoyer, Administratrix for the Estate of Tyler D. Harsh, deceased,

v.

Frederick W. Petroll and HAC Farm Lines Agricultural Cooperative Association and CYNED (A/K/A SINED) Transport Corporation and Pennsylvania Department of Transportation and General Motors Corporation and Chevrolet Motor Division, General Motors Corporation and Jim McKay Chevrolet, Inc.

Appeal of General Motors Corporation.

Eugene S. Harsh, Lois E. Harsh, Cheryl L. Zwoyer, Co-Administrators for the Estate of Douglas Lee Harsh, deceased; Carol A. Zwoyer, Charles J. Zwoyer, Jr., Cheryl L. Zwoyer, Co–Administrators for the Estate of Connie J. Harsh, deceased; and Cheryl L. Zwoyer, Administratrix for the Estate of Tyler D. Harsh, deceased,

v.

Frederick W. Petroll and HAC Farm Lines Agricultural Cooperative Association and CYNED (a/k/a SINED) Transport Corporation and Pennsylvania Department of Transportation and General Motors Corporation and Chevrolet Motor Division, General Motors Corporation, and Jim McKay Chevrolet, Inc.

Appeal of Frederick W. Petroll and HAC Farm Lines Agricultural Cooperative Association and Cyned Transport Corporation.

Eugene S. Harsh, Lois E. Harsh, Cheryl L. Zwoyer, Co–Administrators for the Estate of Douglas Lee Harsh, deceased; Carol A. Zwoyer, Charles J. Zwoyer, Jr., Cheryl L. Zwoyer, Co–Administrators for the Estate of Connie J. Harsh, deceased; and Cheryl L. Zwoyer, Administratrix for the Estate of Tyler D. Harsh, deceased,

v.

Frederick W. Petroll and HAC Farm Lines Agricultural Cooperative Association and CYNED (a/k/a/ SINED) Transport Corporation and Pennsylvania Department of Transportation and General Motors Corporation and Chevrolet Motor Division, General Motors Corporation, and Jim McKay Chevrolet, Inc.

Appeal of Frederick W. Petroll and HAC Farm Lines Agricultural Cooperative Association and Cyned Transport Corporation.

Commonwealth Court of Pennsylvania.

Argued Nov. 4, 2003.

Decided Dec. 10, 2003.

Reargument Denied Feb. 5, 2004.

Thomas Finarelli, Philadelphia, for appellant, General Motors Corporation.

William A. Atlee, Jr., Lancaster and Carl D. Buchholz, Philadelphia, for appellees.

BEFORE: PELLEGRINI, Judge, and FRIEDMAN, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

General Motors Corporation (GM) and Frederick W. Petroll, HAC Farm Lines Agricultural Cooperative Association and Cyned Transport Corporation (collectively, Petroll Defendants) appeal from an order of the Honorable Lawrence F. Stengel of the Court of Common Pleas of Lancaster County (trial court) denying their post-trial motions and affirming the judgment imposing damages between them for their respective liability in causing the deaths of three people involved in an automobile accident.

On April 21, 1995, Douglas L. and Connie J. Harsh, husband and wife, and their infant son, Tyler, were driving in their new 1995 Chevrolet Lumina on Route 30 in Lancaster County. At approximately 3:38 p.m., traffic on Route 30 began slowing and backing up, and according to eyewitnesses, the Harsh's vehicle, which was moving slowly, was struck from behind by Frederick Petroll, who was driving an empty tractor trailer truck at approximately 40 miles per hour and failed to slow down.[1] The Harsh's vehicle was almost immediately engulfed in flames, and all three passengers died from smoke inhalation and severe burns. Suit was filed by the decedents' estates (Plaintiffs) against GM and the Petroll Defendants.[2] The case against GM was based upon two theories of strict liability: 1) a design defect, i.e., that the fuel system of the vehicle was designed so that a fuel-fed fire could occur upon impact to the vehicle from the rear; and 2) a manufacturing defect, i.e., that the fuel system in the Harsh vehicle was improperly manufactured causing gasoline to escape upon impact and a fuel-fed fire to erupt.[3] (*See* Counts XIX through XXX of

1. After being hit by the tractor trailer, the Harsh's vehicle hit the car in front of it and then bounced back to again hit the tractor trailer. It appears from the evidence presented that only the initial impact of the tractor trailer hitting the Lumina is relevant.

2. This Court initially had jurisdiction over this case because the Pennsylvania Department of Transportation (PennDot) was originally named as a defendant. Although PennDot settled with the Plaintiffs prior to trial, this Court continues to retain jurisdiction.

3. In Plaintiffs' March 28, 2000 pre-trial memorandum, they based their design defect case on the following allegations:
 a. *Safety Check Valve*
 The fuel tank on the Lumina was equipped with a safety check valve. This is a plastic component fitted in a steel sleeve immediately inside the inlet pipe of the gas tank. It is composed of a plastic sleeve inside which is a plastic ball that can float to seal the inlet pipe. The GM engineering drawings specify the design dimensions for the safety check valve. The spherical ball diameter, and valve body (plastic sleeve) diameter yields inadequate interference. In the accident, the fuel tank pressure during the impact easily forced the safety check valve ball through the sleeve; easily permitting gasoline to escape through the fuel fill pipe assembly. Thus, the safety check valve failed. The safety check valve, when properly designed and manufactured, can block the ejection of fuel through the fuel tank inlet pipe when the tank experiences increased internal pressure during a collision.
 b. *One–Piece Fill Pipe*
 As early as the 1960's, GM utilized a steel one-piece corrugated fuel tank fill pipe to join the tank and the filler pipe. The purpose of this corrugated design was to permit filler pipe distortions during impact without breach of the fuel storage system. This type one-piece steel corrugated pipe is technologically and economically feasible for the Lumina and would prevent a breach of the fuel tank filler pipe during an impact. GM chose not to utilize this type of one-piece corrugated fuel pipe system on the Lumina because it was more costly and time consuming to install than a multi-piece system. Simply put, it would require more man hours on the assembly line and would cost more. The cause and original of this massive PCFFF was a large amount of gasoline rapidly expelled from the fuel tank. (Plaintiffs' pre-trial memorandum at 3–4.)
 As to their manufacturing claim, they made the following allegations:

Plaintiffs' Complaint.)[4] Negligence was the basis for the suit against the Petroll Defendants. (*See* Counts I through XV of Plaintiffs' Complaint.)

The trial convened on May 20, 2001, and on June 20, 2001, a jury returned a verdict in favor of Plaintiffs in the amount of $8.2 million[5] after finding GM 60% responsible and the Petroll Defendants 40% responsible for the three deaths.[6] Punitive damages, which were sought against GM, were not awarded because the jury determined that GM's conduct was not outrageous.

Plaintiffs then filed a petition for delay damages to be awarded against both GM and the Petroll Defendants and after a hearing was held, an award was entered against GM and the Petroll Defendants in favor of Plaintiffs in the amount of $2,429,165.75. Both GM and the Petroll Defendants filed extensive post-trial motions. The trial court heard arguments on November 13, 2001, and an order was entered on February 5, 2002, denying both GM's and the Petroll Defendants' motions. These appeals by GM and the Petroll Defendants followed.[7] However, before ad-

---

The 1995 Chevrolet Lumina was part of GM's 1988–1996 W-car platform, which included the Pontiac Grand Prix, Buick Regal, and Oldsmobile Cutlass. The "W-car" Fuel System employed a design which featured a filler pipe [the tube where you insert the nozzle of the fuel pump when filling your car with fuel] and vapor pipe attached to the inner-left rear fender. These two pipes made up one continuous piece. They were mated to a 2–inch inlet pipe and vapor pipe on the fuel tank by two rubber hoses, each approximately 8 inches in length. Each end of the two hoses was secured onto a pipe by metal screw clamps. This constituted the fuel filler assembly which included two 8–inch hoses and four metal screw clamps.

Three of the four connections on the "Harsh" Lumina have their clamps and burned sections of the hose material in place. The location for the connection at the filler pipe does not have either a clamp or residual burned hose material. The physical evidence observed reveals no evidence of the presence of a clamp on the filler pipe-hose assembly, which would indicate that either the clamp was not properly tightened, the clamp was omitted or improperly placed during the assembly process. GM has known of this particular failure mode on its fuel systems for a very long time. **The failure of the connection between the hose and the filler pipe caused the PCFFF [post-collision fuel fed fire] that burned the Harsh family to death.** (Emphasis added.)
(Plaintiffs' pre-trial memorandum at 2–3.)

4. In Counts XIX through XXI, Plaintiffs alleged GM was negligent by failing to design

and manufacture a crashworthy vehicle; in Counts XXII through XXIV, Plaintiffs alleged GM was strictly liable for the decedents' injuries resulting from its design, manufacture and assembly of the 1995 Chevrolet Lumina; in Counts XXV through XXVII, Plaintiffs alleged decedents' injuries were caused by GM's negligent design and manufacturing of the 1995 Chevrolet Lumina; and in Counts XXVIII through XXX, Plaintiffs alleged GM was strictly liable for the decedents' injuries resulting from its design, manufacture and assembly of the 1995 Chevrolet Lumina.

5. The jury awarded damages based on the following:

| Douglas Harsh: | Loss of earnings | - $ | 950,000 |
|---|---|---|---|
| | Pain and suffering - | | 250,000 |
| | Emotional distress - | | 750,000 |

| Connie Harsh: | Loss of earnings | - $ | 3,800,000 |
|---|---|---|---|
| | Pain and suffering - | | 250,000 |
| | Emotional distress - | | 750,000 |

| Tyler Harsh: | Loss of earnings | - $ | 1,000,000 |
|---|---|---|---|
| | Pain and suffering - | | 250,000 |
| | Emotional distress - | | 250,000 |

6. In a separate jury trial, Petroll was found guilty of three counts of vehicular homicide and was sentenced to serve 18 months to three years in prison.

7. Our scope of review of the trial court's denial of post-trial motions is whether the trial court abused its discretion or committed an error of law. *Johnson v. City of Philadelphia,* 808 A.2d 978 (Pa.Cmwlth.2002).

dressing GM's appeals, a further explanation of Plaintiffs' claims against GM sounding in tort is necessary in order to understand some of their contentions.

 Plaintiffs' complaint against GM specified that GM was negligent by failing to design and manufacture a crashworthy vehicle, and GM was strictly liable for injuries resulting from its design, manufacture and assembly of the 1995 Chevrolet Lumina. Essentially, Plaintiffs were suing GM under two theories of product liability: 1) negligence and 2) strict liability. Under the first theory, in order to prove negligence, Plaintiffs had to show that GM had a duty to conform to a certain standard of conduct and failed to conform to that standard in the design and manufacturing of the Harsh's 1995 Chevrolet Lumina, and that there was a causal connection between GM's conduct and the resulting injury with actual damage resulting. William L. Prosser, Law of Torts § 30, at 143 (4th ed.1971).[8] However, in Pennsylvania, our Supreme Court has rejected the negligence theory in strict liability cases stating that negligence concepts have no place in a case based on strict liability under a Section 402A of the Restatement (Second) of Torts analysis.[9] *Lewis v. Coffing Hoist Division, Duff-Norton Co.,* 515 Pa. 334, 528 A.2d 590 (1987). As the Third Circuit has explained Pennsylvania law in this area:

> In strict liability, the focus is on a defect in the product, regardless of fault, (citations omitted), and that defect is determined in relation to a particular subset of the general population: the intended user who puts the product to its intended use. In negligence the focus is on the reasonableness of a defendant's conduct, and this reasonableness is determined in relation to a different subset of the general population, and one that is conceivably broad: anyone who foreseeably may be subject to an unreasonable risk of foreseeable harm.

> Rather than looking at strict liability as an easier claim to prove, it is more fruitful to recognize that Pennsylvania law provides a trade-off between the two types of personal injury claims. In strict liability, the plaintiff need not show fault, but only prove a product defect. A product cannot be defective when its design and performance meet all of the requirements of the intended user, regardless of the foreseeability of misuse by unintended users. In negligence, the

8. While negligence at one time was a widely utilized theory upon which a plaintiff could sue and recover for a manufacturer's defectively designed and/or manufactured product, J. Allee, Product Liability § 1.02 (1993), strict liability emerged from warranty cases which did not require proof of negligence. *Id.* at § 1.03. After the Restatement (Second) of Torts was adopted in 1964, specifically, Section 402A(2)(a) of the Restatement (Second) of Torts which provided that the seller of a product was subject to liability to the user even though he had exercised all possible care in the preparation and sale of his product, negligence actions in products liability cases were recognized less often by courts.

9. Section 402A of the Restatement (Second) of Torts provides the following:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

plaintiff must prove fault of the manufacturer, which is an element not required in strict liability law.

*Griggs v. BIC Corporation,* 981 F.2d 1429, 1438 (3rd Cir.1992). *See also DeSantis v. Frick Company.,* 745 A.2d 624, n. 5 (Pa.Super.1999) ("The liability arising from inadequate warnings is not 'strict' in the same sense as liability arising from a defect due to fault in manufacture, since a determination of whether an object is unreasonably dangerous without adequate warnings, and thus defective, necessarily involves negligence principles such as reasonableness or foreseeability.") [10]

■ Under one prong of the strict liability claims, Plaintiffs were alleging that GM defectively designed and manufactured the 1995 Chevrolet Lumina in which the Harsh family was riding on the day they were killed. There are varying methods of proving whether a product was defectively designed. One method is to prove that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Lewis.* In *Lewis,* our Supreme Court also stated that its decision in *Azzarello v. Black Brothers Company, Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978), set forth an alternative approach to determining whether a design defect existed:

[A]fter holding that the supplier of a product is a guarantor of its safety, ... "the jury may find a defect where the product left the supplier's control *lacking any element necessary to make it safe for its intended use* or possessing any feature that renders it unsafe for the intended use."

*Lewis,* 515 Pa. at 340, 528 A.2d at 593.[11] In this case, the trial court utilized the alternate approach set forth in *Azzarello* when instructing the jury, which GM argues was inappropriate.

■ The other part of Plaintiffs' strict liability theory is the manufacturing defect claim. This claim has to do with the actual assembly of the Chevrolet Lumina and any problems during that assembly that may have contributed to the Harsh's demise. In order for Plaintiffs to prove that the Lumina was improperly manufactured, they must prove that the Chevrolet Lumina was defective when it left GM's manufacturing plant. In *Dansak v. Cameron Coca–Cola Bottling Company,* 703 A.2d 489 (Pa.Super.1997), *petition for allowance of appeal denied,* 556 Pa. 676, 727 A.2d 131 (1998), the Superior Court set forth the following ways in which Plaintiffs could meet their burden:

In some cases, the plaintiff may be able to prove that the product suffered from a specific defect by producing expert

---

10. In this case, despite Plaintiffs' complaint alleging negligence against GM, the trial court judge stated that Plaintiffs were *not* seeking a recovery on a negligence theory, and followed Pennsylvania law determining that negligence had no place in a strict liability products case because Plaintiffs were not required to prove that GM was careless or negligent. Consequently, the trial court never charged the jury on whether GM was negligent, more specifically, on the "duty of a car manufacturer," and that is one of GM's complaints on appeal.

11. *See also Phillips v. Cricket Lighters,* 773 A.2d 802 (Pa.Super.), *petition for allowance of appeal granted,* 567 Pa. 763, 790 A.2d 1018 (2001), *reversed in part, affirmed in part and vacated in part,* —— Pa. ——, —— A.2d ——, 2003 WL 22860315 (No. 90 WAP 2001, filed December 3, 2003), holding that in a strict liability case, the plaintiff must establish that the product was unsafe for its intended user, and that a manufacturer will not be held strictly liable for failing to design a product that was safe for use by any reasonably foreseeable user as such a standard would improperly import negligence concepts into strict liability law.

testimony to explain to the jury precisely how the product was defective and how the defect must have arisen from the manufacturer or seller. In cases of a manufacturing defect, such expert testimony is certainly desirable from the plaintiff's perspective, but it is not essential. The plaintiff, even without expert testimony articulating the specific defect, may be able to convince a jury that the product was defective when it left the seller's hands by producing circumstantial evidence. Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect. See Litvin & McHugh, Pennsylvania Torts: Law and Advocacy (1996) § 9.33. However the plaintiff chooses to present his or her case, the goal is the same: to prove that the product was not only defective, but that such a defect existed when it left the hands of the seller.

*Dansak*, 703 A.2d at 496. Here, the jury was informed that it did not need to specify under which strict liability theory it found GM liable, but only that if it found GM liable under one of the theories, it then had to apportion its damages.

▬▬▬ A subset of both the design defect and the manufacturing defect claims is what is known as the "crashworthiness" claim which Plaintiffs did not specifically raise, but which is an aspect of strict liability. "The term crashworthiness means the protection that a motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle acci-

dent." *Kupetz v. Deere & Company, Inc.,* 435 Pa.Super. 16, 644 A.2d 1213, 1218, *petition for allowance of appeal denied,* 539 Pa. 693, 653 A.2d 1232 (1994). The crashworthiness doctrine is explained in more detail as follows:

> [T]hat a supplier is liable for injuries sustained in a vehicular accident because of a defect that was not the cause of the accident, but that caused or enhanced the degree of injuries suffered ... The basis of the doctrine ... is that the manufacturer must design his product so that it is safe for any reasonably foreseeable use. The landmark case in this area is Larsen v. General Motors Corp. (1968, C.A.8 Minn.) 391 F.2d 495. Larsen recognized that, "while automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collision and injury-producing impacts." Thus, Larsen said there should be liability for injuries or enhanced injuries due to a defect that was not the cause of the accident.

Richard M. Goodman and Center for Auto Safety, Automobile Design Liability 3d, Vol. 1, § 1.4 (1996). The crashworthiness doctrine is equally applicable to enhanced injuries resulting from the defendant's manufacturing process of its product. *Oddi v. Ford Motor Company,* 234 F.3d 136 (3rd Cir.2000), *cert. denied,* 532 U.S. 921, 121 S.Ct. 1357, 149 L.Ed.2d 287 (2001). In order to prove whether a vehicle was crashworthy, a plaintiff must show: 1) that the design of the product was defective; 2) an alternative, safer design that was practical existed; 3) what injuries, if any, the plaintiff would have received had the alternative design been used; and 4) the defective design caused or exacerbated specific injuries. *Barker v. Deere & Company,* 60 F.3d 158, n. 3 (3rd Cir.1995). Regarding a manufacturing defect claim, a

plaintiff would have to prove similar evidence, e.g., that the manufacturing process was defective, etc. Several of the issues raised by GM deal with this concept.

## I.

## GENERAL MOTORS' APPEAL

### A. Choice of Law

GM first contends that the trial court erred in applying Pennsylvania law to this case instead of Virginia law because a true conflict of laws existed and Virginia had the most significant contacts to the Plaintiffs' claim against GM. GM filed a pretrial motion seeking application of Virginia law to this case noting that the Harsh family resided in Virginia, they purchased their car in Virginia from a GM dealership, and each of the three Plaintiffs' estates was opened in Virginia.

In Pennsylvania, the choice of law analysis is a two-step process. First, the trial court determines whether a true conflict exists between the laws of the competing states. If a false conflict exists, no further analysis is necessary. "A false conflict exists if only one jurisdiction's governmental interest would be impaired by the application of the other jurisdiction's law. In such a situation, the court must apply the law of the state whose interests would be harmed if its law were not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991). If the court determines that a true conflict exists, it then analyzes the governmental interests and determines which state has the greater interest in the application of its law. *Ratti v. Wheeling Pittsburgh Steel Corporation*, 758 A.2d 695 (Pa.Super.2000), *petition for allowance of appeal denied*, 567 Pa. 715, 785 A.2d 90 (2001).

In this case, the trial court found that a "false conflict" existed between Virginia's interests and Pennsylvania's interests; the

contacts with Virginia were minimal and had nothing to do with the liability issues; and that Pennsylvania had the most significant relationship to the occurrence and to the parties involved in matter. Further, Pennsylvania's law provided a greater possibility of recovery for the Plaintiffs, while Virginia's law limited GM's exposure. As to the significant relationship the parties had with Pennsylvania, the trial court stated:

> The only relationship that ever existed between these parties arose out of the fatal accident which occurred in Pennsylvania. Section 175 of the Restatement (Second) of Conflicts of Law states: "In an action for deaths, the law of the state where the deaths occurred normally determines the rights and liabilities of the parties, unless another state, applying the contacts test, has a more significant relationship to the occurrence and to the parties." Thus, in accordance with this principle, the law of the state where the death occurred is given great deference.

(Trial court's decision at 59–60.)

Assuming, *arguendo*, that a true conflict exists as GM contends, the Superior Court in *Laconis v. Burlington County Bridge Commission*, 400 Pa.Super. 483, 583 A.2d 1218 (1990), *petition for allowance of appeal denied*, 529 Pa. 615, 600 A.2d 532 (1991), *cert. dismissed*, 503 U.S. 901, 112 S.Ct. 1254, 117 L.Ed.2d 485 (1992), conducted a choice of law analysis between the application of Pennsylvania or New Jersey law in a personal injury action that also occurred in Pennsylvania and came to the same conclusion as the trial court did in this case—that the state where the injury occurred was to be given great deference. Utilizing the following choice of law principles, the Superior Court held that Pennsylvania law would apply:

The following contacts which are to be applied qualitatively rather than quantitatively under the case law, that are taken into account in determining which state law applies: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship between the parties is centered. Furthermore, *"in an action for personal injuries, the law of the state where the injury occurred normally determines the rights and liabilities of the parties, unless another state, applying the contacts test, has a more significant relationship to the occurrence and the parties."* (Emphasis added.)

*Laconis,* 583 A.2d at 1222–1223. Although GM wants Virginia law to apply so as to allow for an outcome in its favor, just because the Harsh family resided in Virginia, their Chevrolet Lumina was purchased in Virginia, one named Plaintiff is a citizen of Virginia, and three of the Plaintiffs opened up their estates in that state, those contacts are not sufficient to change the trial court's determination because the accident and three deaths occurred in Pennsylvania.

## B. Admissibility of Crash Tests

GM next contends that the trial court's order should be vacated and a new trial ordered because the crash tests which GM conducted to simulate what happened to the Harsh vehicle were not allowed into

evidence, thereby allowing Plaintiffs to paint an inaccurate picture of the accident scene and prejudice the case against GM.

The two crash tests that GM wanted to offer into evidence were videotapes of its re-creations of the accident depicting the performance of the Chevrolet Lumina fuel tank upon impact with a tractor trailer.[12] For the first test, GM obtained an unmodified Kenworth tractor trailer that was substantially similar to the truck operated by Petroll and the same model Chevrolet Lumina that the Harsh family was driving. In a controlled test environment, using a "sled," i.e., a truck that assists in powering the tractor trailer down a track, GM engineers sent the tractor trailer hurdling down a track into the rear of the Chevrolet Lumina at 40.2 miles per hour. The tractor trailer came up over the back of the Lumina nearly enveloping the vehicle. For the second test, GM replaced the bumper on the front of a Kenworth tractor trailer and installed steel I-beams under the chassis to fortify the new bumper, making this bumper wider and higher than the bumper involved in the accident. Again, GM engineers sent the truck hurdling down the track into the back of the Lumina at a speed of 38.2 miles per hour. This time, the truck caused the rear of the Lumina to suffer a substantial crush upon impact before being jettisoned down the track away from the tractor trailer. GM wanted to offer the second crash test into evidence to demonstrate that the fuel tank only suffered abrasions and scrapes from

---

**12.** According to GM, Plaintiffs' "design defect theory" was based upon the assumption that a rear end hit by a tractor trailer traveling at 38 miles per hour would pop the anti-spitback ball through the mouth of the tank. Plaintiffs' manufacturing defect theory was based upon the assumption that the same rear end hit would dislodge a loosely clamped hose from the fuel fill pipe. By crashing a truck of similar weight into a car of identical design,

GM experts tested those assumptions, intentionally leaving the hose unclamped, and even raising the speed slightly to average the calculations of the opposing reconstructionists. What they found was that Plaintiffs' assumptions were invalid. That anti-spitback ball did not fly from the tank, the hose did not separate from the fill pipe, and pressurized fuel did not spray from the hose. (GM's brief at 13.)

the road surface causing small openings or tears in the bottom of the fuel tank, and that the fuel filler line did not separate from the fuel tank.

The trial court ruled that neither test was admissible because the crash displayed in each videotape was not substantially similar to the actual accident. As to the first test, the trial court stated that all parties agreed that this test bore no resemblance to the crash involving the Petroll tractor trailer and the Harsh Lumina. As to the second crash test, the trial court did not allow its admission into evidence because the tractor trailer was significantly modified and, therefore, very different from the tractor trailer that was involved in the accident. The trial court stated: "The bumper in the second crash test resembled a snow plow more than it did a bumper. The reinforcing I-beams, welded to the chassis, certainly changed the distribution of force in the accident. Simply stated, the front end of the truck used in the crash test was very different from the front end of the truck involved in the accident." [13] (Trial court's decision at 38.) Finding that the dramatic and violent re-

creation of the accident was not similar to the actual accident, the trial court also disallowed the admission of the crash tests because of the visual impact the crash test would have on the jury and because its probative value was far outweighed by its prejudice.[14]

GM does not seriously dispute that the first crash test should have been disallowed because the results of that test were not really representative of the actual accident. However, it argues that the results of the second crash test should have been admitted because the test car and the fuel tank exhibited damage generally similar to that which occurred in the actual accident. GM contends that if the use of a reinforced bumper brought about any change in force distribution, the change did not show in the test results: [15] "GM had set out to demonstrate that plaintiffs' theory was incorrect, that the initial impact would not have popped the anti-spitback ball, dislodged the hose, and sprayed pressurized fuel from the Lumina's tank. The test showed exactly that, and more, because the energy absorbed by the test car sur-

13. The trial court noted that although there were multiple split-second impacts involving the tractor trailer and the Lumina, the point of the crash test was to demonstrate the crush suffered by the Lumina on the first impact alone.

14. Specifically, the trial court stated:
General Motors' defense was to attribute the fire in the Harsh vehicle to the terrible impact with the truck. General Motors maintained, explicitly and implicitly, throughout the trial that no one could have survived this impact, that the fire was caused by the tremendous impact, and that the design of the fuel system was largely immaterial. The crash test, offered ostensibly to demonstrate the performance of the fuel tank, also gave the jury a dramatic and violent re-creation of the accident itself. The problem with this dramatic re-creation is that it was not similar to the accident. There was ample evidence in the photo-

graphs taken at the scene and in the testimony of eye witnesses that the Harsh vehicle suffered a tremendous crush from the impact.
(Trial court opinion at 38–39.)

15. GM explains that the purpose of the bumper modification was to make the simulation more accurate. "In the first test the truck's front had ridden over top of the smaller Lumina, something which had not occurred in the accident. The explanation was simple— Petroll had locked his brakes, causing the front of his truck to dive. Mechanically propelled at a constant speed, the test truck had no driver to lock its brakes. GM could simulate the dive that accompanies braking only one way, by changing the bumper configuration so that it would hit the test car just like the bumper on Petroll's truck hit the Harsh car." (GM brief at 14.)

passed the energy absorbed by the Lumina, and none of those things occurred. That result can hardly be said to have diminished the relevance of the test." (GM's Reply Brief at 2.)

■ The admissibility of evidence, including demonstrative evidence, rests largely within the discretion of the trial court. *Leonard v. Nichols Homeshield, Inc.,* 384 Pa.Super. 1, 557 A.2d 743 (1989), *petition for allowance of appeal denied,* 525 Pa. 584, 575 A.2d 115 (1990). Where the demonstration of evidence is a physical representation of the incident or event, the conditions must be sufficiently close to those involved in the accident at issue to make the probative value of the demonstration outweigh the prejudicial effects. *Id.* An appellate court will only reverse the trial court's admission of such evidence upon a clear showing of an abuse of discretion. *Stecher v. Ford Motor Company,* 779 A.2d 491 (Pa.Super.), *petition for allowance of appeal granted,* 568 Pa. 619, 792 A.2d 1254 (2001), *vacated and remanded on other grounds,* 571 Pa. 312, 812 A.2d 553 (2002).

■ Here, relying upon the reports of Plaintiffs' experts, the trial court ruled that neither crash test was admissible because neither was similar enough to the actual crash. Because it is not disputed that the first crash test was not representative of the events that took place, we need only address the second crash test. Regarding the second crash test, the evidence of record indicates that Plaintiffs' accident reconstruction expert, Andrew Irwin (Irwin), analyzed the two crash tests[16] and issued a written report on March 13, 2001, concluding that the second test was not similar to the actual accident. Initial-

ly, Irwin did state in his report that the second test resulted in damage to the rear of the test vehicle that was generally similar to that which occurred in the actual accident; however, he further stated that the front of the tractor trailer had been modified, explaining as follows:

> The modifications included using a different bumper on the front of the truck and installing a steel support-structure behind the bumper. The lower edge of the bumper on the test truck was lower than that on the actual accident vehicle and on the vehicle used in the first test. The steel structure installed behind the bumper provided additional connections between the frame of the truck-tractor and the bumper itself. These additional connections provided additional reinforcement to the bumper and increased the stiffness of the front of the vehicle.

(Irwin report at 2.) Based on these modifications, Irwin concluded that the modifications performed to the tractor trailer in the second test altered the behavior of the vehicle's structure and, correspondingly, altered the behavior of the rear of the Lumina in response to being struck. He specified: "The extent of the effect of the modifications to the truck-tractor involved in the second test are unknown since no testing involving a truck-tractor similar to the one in the accident has been accomplished that resulted in damage similar to what occurred in the actual accident." (Irwin report at 3.)

Plaintiffs' accident reconstruction expert, David Stopper (Stopper), issued a report dated March 15, 2001, regarding the crash tests and also determined that the second test was not a valid representa-

---

**16.** Irwin not only reviewed the crash test videotapes from both tests, but also reviewed the crash test documentation and data from both tests; inspection, photography and measure-ment of the Luminas damaged in the tests; and inspection and photograph of the damaged tractor-trailers involved in the tests.

tion of the circumstances of the accident that occurred on April 21, 1995. He made the following findings in his report:

On Test Vehicle No. 2, the front bumper of the 1986 Kenworth COE was significantly larger than the bumper involved in the Harsh vehicle collision. It was also found that a fresh, welded structure, in the form of a large iron battering ram, had been affixed to the back of the bumper, undercarriage and front axle suspension. It has been welded under and attached to the front axle leaf springs below the frame and welded to the back of the front bumper.

The steel reinforcement plate that had been added, is not OEM (Original Equipment Manufacturer), nor is it typical after-market design. The plate on the back of the bumper, a U shaped steel beam, was 6 inches wide, 1.75 inches deep, and it was 4 feet long. This was attached to 4 steel bars that extend from the front bumper, back to the leaf spring. They were 31.5 inches long, 4 inches wide and 1.5 inches deep. The thicknesses of the steel beams were 7/16".

*The ram style structure appears to have been built to insure maximum strength to the front of the vehicle so as to achieve maximum restitution and maximum crush.* The front axle was equipped with an automatic limiting valve (Bendix Westinghouse LQ4). The automatic limiting valve was intact and undamaged due to its position to the rear of the ram structure, which protected it behind the front bumper. This modification to the front bumper with structural reinforcement along with the additional size of the front bumper, which covered the modification, was not representative of the 1989 Kenworth involved in the collision. The ram structure held up very well, resulting in no

override of the "Crash Test # 2" car and maximized crush potential.

The front bumper had virtually no bending in the impact area supported by the structural reinforcement. It is important to note that this structure is inconsistent with bumper support structures on the market. The modification would severely restrict front suspension movement and render it unsafe to be driven. The front bumper was welded and braced to the front axle leaf springs, which under normal operation or under heavy braking would compress. This structure would severely inhibit the handling characteristics and movement of the front axle, therefore rendering it inconsistent with any highway vehicle of this make and model as well as the accident truck tractor.

*The modification to the Crash Test # 2 Kenworth clearly resulted in the maximum damage to the rear of the test Chevrolet Lumina and is not representative of the accident Kenworth truck tractor.* It is my opinion this crash test is not a valid representation of the circumstances of the Harsh fatality April 21, 1995.

(Stopper March 15, 2001 report at 8–11.) (Emphasis added.) To the contrary, GM's experts issued reports stating that the crash tests provided the "actual Harsh crash results" (March 30, 2001 report of Alan Thebert), and that the tests were "very useful in the analysis of the Harsh accident. Information for use in analyzing this type of very severe impact is limited because of the severity and the massiveness of the striking vehicle. It just has not been done with any great frequency." (March 29, 2001 report of William G. Cichowski.)

■ The trial court obviously found Plaintiffs' experts more credible regarding the results of the second crash test. Be-

cause the trial court has discretion when determining whether to admit documents into evidence, and the reports of Plaintiffs' experts clearly indicated that there were sufficient differences that existed between the actual accident and the crash test results in the second test, the trial court did not abuse its discretion by refusing to allow those test results into evidence.[17]

## C. Admissibility of Computerized Animations

GM further argues that while holding its demonstrative evidence inadmissible, the trial court improperly applied a far less restrictive test to Plaintiffs' demonstrative evidence which was in the form of computerized animations and which it allowed into evidence for the purpose of providing the jury with a picture of the event that was being described by expert witnesses. GM points out that in Plaintiffs' animations, the accident depicted showed the car bursting into flames which the trial court allowed into evidence, unlike GM's crash test showing the same but disallowed.

Plaintiffs offered three animations prepared under the direction of Anand Kasbekar, Ph.D. (Dr. Kasbekar), a mechanical engineer, depicting: 1) the fuel tank and anti-spit back valves; 2) the underside of the Lumina; and 3) the accident sequence. GM only objected to the first and third animations. Dr. Kasbekar testified regarding the procedure used in preparing the animations which included taking measurements, employing a computer program to translate those measurements into a computer visualization, studying photographs and reports and referring to published specifications, exemplars and models of vehicles. The trial court stated that it was satisfied that each animation was based upon facts made available to Dr. Kasbekar regarding the specifications of the fuel tank and the valve and the events that took place during the accident sequence, and that his methodology was thorough. The trial court noted that GM had every opportunity to cross-examine Dr. Kasbekar and two other witnesses, including Plaintiffs' accident reconstructionist, Andrew Irwin (Irwin), who supplied Dr. Kasbekar with information upon which he relied to create the animations.

■ GM, however, argues that the animations were based on misinformation, e.g., Irwin did not know the distance between each of the vehicles stopped in traffic, did not have exact information on the impact angle the second time the Lumina was struck in the rear, and did not know when the fire began, but GM did not have an opportunity to cross-examine him. GM explains that while counsel for GM prepared to cross-examine Irwin on the animations, Plaintiffs decided not to offer them until after Irwin had left the witness stand. The animations were only offered when another liability expert of Plaintiffs, John Marcosky, was testifying; however, he had not provided any of the data upon which the animations were based and was not presented as an expert in accident

---

17. GM also argues that the trial court erred by refusing to admit the crash tests into evidence based on their prejudicial effect because the court found them to be powerful and dramatic (i.e., showing a fire erupting from the impact) and an improper basis for the jury to use in making a decision. GM contends that if the trial court's standard was correct, no one would ever be able to introduce demonstrative evidence in cases involving dramatic events. We agree with GM that the trial court erred by disallowing the crash test on the basis of its dramatic effect, and if the crash test had been admissible as sufficiently similar to the accident, it also would have been admissible regardless of its dramatic effect, but because it was dissimilar to the actual accident, the trial court did not err by disallowing the crash test on this basis.

reconstruction. Therefore, GM argues that it was precluded from meaningful cross-examination concerning the animations and the trial court did not apply the same standard to the animations that it had applied to GM's crash tests.

As the trial court stated in its opinion, GM had the opportunity to cross-examine every witness regarding the animations, including Dr. Kasbekar, regarding his method of preparation of the animations, and Irwin, who aided Dr. Kasbeker. If GM chose not to cross-examine these individuals at trial when they were offered or to call them in their own presentation of their case, that was a choice that was made that cannot be undone now. Although GM also complains that the trial court saw nothing prejudicial about the animated depiction of fire, but precluded its crash test because it was too "dramatic" because of its depiction of the fire after the crash occurred, we believe the exclusion of the second crash test was not erroneous because the trial court excluded it based on its dissimilarities to the actual accident. As we have already stated, had the crash test been sufficiently similar, it would have been an error for the trial court to exclude the crash test as being too "dramatic" on that basis alone.

### D. Evidence Regarding GM's Compliance With Federal Motor Vehicle Safety Standards

The trial court disallowed evidence of GM's compliance with the Federal Motor Vehicle Safety Standards (FMVSS) finding that Plaintiffs' design defect theory was premised solely upon strict liability, and that the issue regarding design defect was not whether GM complied with a standard of care as defined by federal regulations, but whether the product was defectively designed regardless of GM's conduct. GM, which intended to offer the evidence to prove that the Lumina was not defective,[18] contends that the trial court erred by refusing to allow it to prove that it met the FMVSS standard which requires, in part, that a car be able to withstand one 30 mile per hour rear impact from a 4,000 pound moving barrier without permitting a fuel leak above a specified maximum allowable rate. GM states that it had planned to tell the jury that the Lumina was tested to surpass and did surpass that standard, and that the standard that the forces unleashed in the crash tests by the two nearly 40 mile per hour rear impacts from the 30,000 pound tractor trailer dwarfed those forces against which FMVSS requires manufacturers to protect.

In support of its argument, GM cites *Jackson v. Spagnola*, 349 Pa.Super. 471, 503 A.2d 944 (1986), *petition for allowance of appeal denied*, 514 Pa. 643, 523 A.2d 1132 (1987), in which our Superior Court held that compliance by a car manufacturer with FMVSS was admissible into evidence because compliance with those standards was "only a piece of the evidentiary puzzle" and did not grant the car manufacturer immunity from strict liability. *Jackson*, 503 A.2d at 948. "While compliance with FMVSS is not conclusive as to the absence of liability under a theory of strict liability, compliance is of probative value in determining whether there was a defect." *Id.*

■ However, in *Lewis v. Coffing Hoist Division, Duff–Norton Company, Inc.*, 515 Pa. 334, 528 A.2d 590 (1987), our Supreme Court specifically addressed the issue of whether a trial court properly excluded evidence of industry standards

---

18. GM never intended to offer evidence of its compliance with FMVSS for purposes of punitive damages. Had it done so, that evidence may have been relevant. However, because punitive damages were not awarded, that issue is of no moment.

relating to the alleged defect design of an electric control box, concluding that negligence concepts had no place in a case based on strict liability. It explained:

> Indeed, Section 402A of the Restatement (Second) of Torts [19] makes it clear that the imposition of strict liability for a product defect is not affected by the fact that the manufacturer or other supplier has exercised "all possible care."

> Although there is general agreement among the courts of the various jurisdictions that the manufacturer's due care *vel non* has no bearing in a case based on strict liability for the defective design of a product, the courts part company when it comes to the relevance, and hence admissibility, of evidence showing industry standards, customs and practices concerning the design of products. There are appellate courts which hold that evidence of industry standards is relevant to the question of whether a product design is "unreasonably dangerous," or that such evidence is probative of the feasibility of proposed alternative designs. *E.g., Rucker v. Norfolk & Western RR.*, 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979); *Dugan v. Sears, Roebuck & Co.*, 113 Ill.App.3d 740, 69 Ill.Dec. 620, 447 N.E.2d 1055 (1983); *Back v. Wickes Corp.*, 375 Mass. 633, 378 N.E.2d 964 (1978); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978); *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192 (4th Cir. 1982) (applying South Carolina law).

> Other jurisdictions have taken a contrary view with regard to the relevancy of industry standards in a strict-liability case. Using the theory that negligence concepts are to be kept out of cases based on strict liability under Section 402A, various courts have excluded attempts by manufacturer-defendants to prove that the quality or design of the product in question comports with industry standards or is in widespread industry use. Such a holding was rendered by the Supreme Court of Washington in *Lenhardt v. Ford Motor Co., supra*[, 102 Wash.2d 208, 683 P.2d 1097 (1984)]. In *Lenhardt* the Court concluded that the question of whether or not the defendant has complied with industry standards improperly focuses on the quality of the defendant's conduct in making its design choice, and not on the attributes of the product itself. Therefore, in the view of the *Lenhardt* Court, such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry.

*Lewis,* 515 Pa. at 341–342, 528 A.2d at 593–594. *See also Spino v. John S. Tilley Ladder Company*, 548 Pa. 286, 696 A.2d 1169 (1997).[20] Consequently, based on *Lewis,* the trial court properly excluded GM's evidence regarding its compliance with FMVSS.

### E. Evidence of "Subsequent Remedial Changes" By General Motors

Plaintiffs' main allegation regarding the manufacturing defect of the fuel system was that the filler neck clamp was missing from the fuel system in the Harsh vehicle. The evidence in question established that on September 15, 1994, GM engineers con-

---

**19.** *See* ftnt. 9. "It is now well established that the foregoing provision imposes strict liability in tort not only for injuries caused by the defective *manufacture* of products, but also for injuries caused by defects in their *design.*" *Lewis,* 515 Pa. at 340, 528 A.2d at 592. (Emphasis in original.)

**20.** In that case, our Supreme Court held that evidence of due care by a defendant is both irrelevant and inadmissible in a products liability case because a manufacturer may be strictly liable even if it used the utmost care.

ducted what is known as a Process Failure Mode and Effects Analysis (PFMEA) applicable to the fuel system of the Lumina. The PFMEA is an engineering method of documenting potential failures in the process of manufacturing a product. Plaintiffs alleged that prior to January 1995, GM engineers recommended action to remedy two potential causes of the failure mode. Among the potential failure modes identified was the omission or undertorquing of the clamp connecting the fuel filler hose to the fuel tank and fuel filler neck. The engineers recommended action to remedy the failure mode included a visual check of the filler neck clamps in the assembly process, which *was subsequently modified to a hands-on check by an operator at the assembly plants to ensure that the clamp was properly placed and tightened.* Plaintiffs alleged that the testimony of GM's engineers established that the target completion date for the implementation of the operator hand check was March of 1995. The Harsh vehicle was assembled on March 22, 1995; however, Plaintiffs argued that because the plant in which the Harsh vehicle was assembled did not implement the assembly process change until September of 1999, this subsequent remedial change was proof of wrongdoing by GM.

Relying on our Supreme Court's decision in *Duchess v. Langston Corporation*, 564 Pa. 529, 769 A.2d 1131 (2001),[21] the trial court allowed this information into evidence finding that although it **did not** constitute a subsequent remedial measure because the change in the assembly process was intended to be instituted **prior to the assembly of the Harsh vehicle,** the exceptions to Pennsylvania Rules of Evidence 407[22]—admissible for impeachment or to prove other controverted matters such as **feasibility** of precautionary measures—were implicated. *Duchess* defined feasibility in this context to encompass "considerations of cost and practicality and technological possibility." 564 Pa. at 554, 769 A.2d at 1146. The trial court stated:

> Given the position of General Motors that the PFMEA conducted in September 1994 with a "target completion date" of March 1995 did not apply to 1995 model year W-cars, including the Harsh vehicle assembled in March 1995, I found that the exceptions in Rule 407 were implicated. General Motors placed feasibility in issue and plaintiffs were permitted to establish the feasibility, i.e., the cost, practicality and technological possibility, of the change in the assembly process and to impeach General Motors' assertion that the PFMEA did not or could not apply to the 1995 model W-cars.

(Trial court decision at 15.)

■ General Motors, however, argues that the trial court erred by allowing Plaintiffs to introduce this evidence, if only

---

**21.** *Duchess* dealt with whether evidence of subsequent remedial measures was admissible to prove evidence of a product defect in a strict liability case. Determining that it was not, our Supreme Court then went on to hold that even if such evidence was not admissible, relevant exceptions might be implicated, including the feasibility of taking precautionary measures, control and ownership.

**22.** Pa. R.E. 407 entitled "Subsequent Remedial Measures" provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove that the party who took the measures was negligent or engaged in culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for impeachment or to prove other controverted matters, such as ownership, control, or feasibility of precautionary measures.

to prove feasibility, because the change related to a change in the assembly process for its model year vehicles "W-car, '96.5–'98," referring to the 1996.5 through 1998 model year W-cars, had little if any bearing on the question of whether a defect existed in one particular 1995 model year car. GM further argues that it was not contesting feasibility because it never suggested that an additional operator would have added an unbearable cost penalty or posed technological problems either in terms of safety or performance. We agree with GM that the trial court improperly allowed the evidence in under the exception to Pa. R.E. 407 because the change was to go into effect prior to the assembly of the Harsh's car and, therefore, this was not a matter of a subsequent remedial change.

Nonetheless, we believe the evidence was probative regarding the lack of a clamp or a defective clamp. GM was obviously aware that it was having problems with the clamp and was going to implement this change in all of its plants by March of 1995. The failure to implement such a measure shows how the defect in the manufacturing process could occur and be cured. As such, the trial court properly allowed Plaintiffs to establish the feasibility of the change in the assembly process and to impeach GM's assertion that the PFMEA did not or could not apply to the 1995 Lumina model.

### F. Evidence of Due Care

GM also contends that it is entitled to a new trial because the trial court prevented GM from presenting evidence of due care related to the design of the Lumina fuel system. GM explains that Plaintiffs pled and took discovery based upon a claim that GM was liable for negligent design, and during trial, they argued for and obtained favorable rulings that allowed them to introduce all the evidence they chose in support of that claim, including evidence that was to establish that GM had a company-wide attitude hostile to safety. Then Plaintiffs told the trial court that their negligence claim concerned only the manufacturing process, depriving GM of the right to defend against Plaintiffs' negligent design claim. GM points out that the trial court's decision only addressed Plaintiffs' claim of negligence in the manufacturing process, and just because the jury found in its favor on the issue of punitive damages, it should not have been precluded from presenting evidence of due care for the negligent design aspect of the case.

Despite GM's contention that it was precluded from presenting any testimony regarding GM's safety programs, particularly those related to the design of the Lumina fuel system, the trial court allowed Robert Sinke, one of GM's experts, to testify, stating the following:

THE COURT: To the extent that there is some description of GM safety programs and this witness has participated in them, I think that's a reasonable area to cover in his background and experience with the company. I think Mr. Atlee's concerns are well taken that we don't get into a long description of everything GM does to make their cars safe. I think it isn't—it is-this is about *the design and manufacture of this fuel system.*

*There's design issues here and issues regarding the procedure at the Oshawa assembly plant and as to whether the clamp was put in place* and so forth. So I think company-wide self-serving safety statements I think are probably beyond the scope of the issues in this case, but to the extent that this witness has been involved in certain programs, I think he can say that.

And as to the defect analysis procedure, there is a—there is a clear allegation here that this car was released from the Oshawa plant without the clamp being tight enough, or perhaps missing, and it's a circumstantial case really, because no one saw what happened. And I think they're allowed to address the circumstances to allow the jury to consider other inferences from the facts surrounding the manufacture of this car. (Emphasis added.)

(Notes of testimony, Vol. XV, at 2269–2270.) Clearly, the trial court permitted Mr. Sinke to testify about GM's safety programs relating to both the **design** and **manufacturing** of the Lumina fuel system. As such, GM's argument is without merit.

### G. Rule 238 Damages

As it did before the trial court in response to Plaintiffs' motion for the request of delay damages under Pa. R.C.P. No. 238 (Rule 238 damages), GM argues that Rule 238 damages are unconstitutional because future damages are not reduced to present value. GM contends that Rule 238 damages are inconsistent with the rationale, underlying *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980), which requires an acceleration of the payment of future losses on the theory that, over time, inflation will totally offset the earning power of money.[23]

Rule 238 damages are awarded to plaintiffs when there is a delay in actions for bodily injury, death or property damage. Rule 238(a)(1) provides:

At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, dam-

ages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, in the decision of the court in a nonjury trial or in the award of arbitrators ... and shall become part of the verdict, decision or award.

Rule 238(a)(2) provides that damages shall be awarded for the period of time from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision, and subsection (a)(3) provides that damages shall be calculated at the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded, plus one percent, not compounded.

In awarding Plaintiffs delay damages, the trial court relied upon the Supreme Court's decision in *Laudenberger v. Port Authority of Allegheny County,* 496 Pa. 52, 436 A.2d 147 (1981), *appeal dismissed,* 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982), holding that for purposes of equal protection, plaintiffs and defendants are not similarly situated in that plaintiffs have been wrongfully injured and suffered financial losses because of defendants' actions and defendants have suffered no wrong. As tortfeasors, they are not unjustly deprived of compensation during the course of the pre-trial delays. The trial court recognized that *Laudenberger* did not deal with the current version of Rule 238, but, nonetheless, stated that it controlled the constitutional issue presented because when the former Rule 238 was suspended in *Craig v. Magee Memorial*

---

**23.** GM acknowledges that the trial court was bound by *Kaczkowski* and required to reject its constitutionality argument so it is only raising the same issue now before this Court to preserve it on appeal to the Pennsylvania Supreme Court in the event that we also follow precedent. *See* ftnt. 30 *supra.*

*Rehabilitation Center,* 512 Pa. 60, 515 A.2d 1350 (1986), the Supreme Court did not overrule the rationales of *Laudenberger.*

 Additionally, the trial court relied on a Superior Court case which reviewed the constitutionality of the present Rule 238 and concluded that it "is not patently unconstitutional, and any further determination in this respect can only emanate from the Supreme Court." *Dietrich v. J.I. Case Company,* 390 Pa.Super. 475, 568 A.2d 1272, 1279 (1990), *petition for allowance of appeal denied,* 528 Pa. 610, 596 A.2d 157 (1991). Although not addressing the specific issue of Rule 238 damages and constitutionality, the Supreme Court recently applied Rule 238 damages in *Allen v. Mellinger,* 567 Pa. 1, 784 A.2d 762 (2001) (delay damages recoverable from Commonwealth parties are limited to those calculated based upon the statutory cap). Because Rule 238 delay damages are constitutional, there was no error by the trial court in awarding Plaintiffs Rule 238 delay damages.

### H. Fairness of the Proceedings

Finally, GM contends that the trial court continually favored Plaintiffs in its rulings throughout the month-long trial so as to deny GM a fair trial. Specifically, it alleges the following improper rulings:

### 1. Statistical Evidence

GM contends that the trial court allowed the introduction of statistics concerning post-collision fires through the deposition testimony of Plaintiffs' expert, Paul Mutty, but GM's expert, William Wecker, Ph.D., was precluded from testifying regarding accident statistics and his opinions based on those statistics which were drawn from the Fatal Accident Reporting System (FARS), a database maintained by the National Highway Traffic Safety Administration, a federal government agency. GM explains that FARS is a census of fatal motor vehicle accidents on public roads in the United States which is maintained not for litigation purposes, but "because the government views the data as reliable information for those working to make automobiles safer." (GM's brief at 52.)

 GM is incorrect on this issue in all respects. Initially, we note that the only evidence introduced during Mr. Mutty's deposition were GM's documents, none of which dealt with statistics on post-collision fires. Additionally, the trial court did not allow GM's expert to testify regarding any statistics from FARS because, prior to trial, Plaintiffs filed a motion-in-limine to preclude GM from introducing evidence relating to accident statistics. They argued that in a strict liability action, evidence about statistical frequency/severity studies of accidents would improperly introduce negligence concepts into a case based on strict liability. The trial court granted Plaintiffs' motion to preclude accident statistics on the basis that evidence regarding other reports of accidents was irrelevant and inadmissible unless it was demonstrated that the occurrences happened under reasonably similar circumstances to those at issue in Plaintiffs' case. When GM filed a motion for reconsideration, the trial court denied the request because Dr. Wecker could not describe the speed of any of the vehicles; identify the vehicles involved; describe the nature of the impacts, i.e., rear end collision, frontal collision, or rollover collision; whether the occupants were killed as a result of the impact or as a result of the post-collision fire, and, therefore, there was no basis to prove that the incidents described in the statistical reports were sufficiently similar to the Harsh incident.

 Questions regarding the admission or exclusion of evidence are within the sound discretion of the trial court and may

be reversed only when there is a clear abuse of discretion. *Soda v. Baird,* 411 Pa.Super. 80, 600 A.2d 1274 (1991), *petition for allowance of appeal denied,* 532 Pa. 665, 616 A.2d 986 (1992). The fundamental consideration in reviewing the trial court's decision regarding the admission of evidence is its relevance. *Martin v. Soblotney,* 502 Pa. 418, 466 A.2d 1022 (1983). Because Dr. Wecker did not have sufficient information about the statistics to which he was going to testify to somehow show their relevance to the tragedy that occurred in this case, there is no question that the trial court properly refused to allow GM's expert to testify.

### 2. Expert Witness Disclosures

GM argues that the trial court unfairly required it to produce anything Plaintiffs requested during discovery relative to the crash tests it performed, but Plaintiffs did not produce everything it had relative to tests performed by Campbell Laird, Ph.D. (Dr. Laird), a metallurgical engineer, on exemplar fuel tanks. GM alleges that Plaintiffs' discovery responses only disclosed that tests had been conducted, but that it first found out about the details of the tests that were performed by Dr. Laird at the same time the jury found out. The trial court, however, noted that prior to trial, Plaintiffs had served on GM copies of Dr. Laird's various expert reports which stated the protocol he followed for the testing as well as the results of the testing with the supporting charts. It continued by stating:

> Prior to Dr. Laird's testimony, General Motors asked for an offer of proof as to tests performed by Dr. Laird. Counsel for General Motors objected to the "pressure-to-deform-the-tank" test. Initially, counsel for General Motors denied having any evidence of this test. He boldly told the court: "I was unaware that he did any such test, and I would

object because I have not heard of that until today ... I've been involved in this case for years and I've never heard that Dr. Laird had done a test until this moment." (N.T., Vol. 7 at 847.)

> Counsel did admit, however, to having a copy of Dr. Laird's February 23, 2001 report but "thought ... he [Dr. Laird] had done some calculations regarding the yielding of this metal and that sort of thing ... but I certainly didn't have any evidence of any tests being done on a tank to show what type of pressure it can withstand." (N.T., Vol. 7 at 848.) A review of the February 23, 2001, report shows that, in fact, General Motors had been put on notice that tests had been performed. The report concludes: "[I]t takes pressure of a 45 psi to cause the onset of general yielding in a virgin tank in a subject Lumina and 50 psi to produce significant irreversible bulging as my calculations, report and *as my tests reveal.*" (N.T., Vol. 7 at 840.) (Emphasis added.) The report could not have been any clearer—Dr. Laird performed tests to establish and support his conclusions. General Motors was not "ambushed" at trial.

(Trial court decision at 63–64.) Based on this explanation by the trial court, GM's argument is baseless.

### 3. Rebuttal Evidence

GM contends that the trial court erred by allowing Plaintiffs to call John Marcosky to testify in rebuttal to one of GM's experts despite the fact that his rebuttal testimony did not respond to new matter. It cites *Klyman v. Southeastern Pennsylvania Transportation Authority (SEPTA),* 331 Pa.Super.172, 480 A.2d 299 (1984), for the proposition that a party cannot offer in rebuttal that which is properly part of his case-in-chief, and is confined to matters requiring explanation and to answering

new matter introduced by his opponent. In *Klyman*, the appellant responded to interrogatories by a letter stating that it had an expert witness who was going to testify regarding calculations based on skid marks. SEPTA objected that this information was insufficient and requested a summary of the witness' intended testimony. The requested report was never provided and then the appellant attempted to offer the expert as a rebuttal witness. The trial court disallowed the expert as a rebuttal witness because his testimony could have been garnered during appellant's case-in-chief.

In this case, the rebuttal testimony of Mr. Marcosky addressed the factual basis of GM's witness, William Cichowski, who performed a pressurization test. The trial court found that even if Mr. Marcosky's testimony should have been presented during Plaintiffs' case-in-chief, a new trial was not warranted because it directly contradicted evidence offered by Mr. Cichowski. The decision as to what is proper rebuttal evidence is within the discretion of the trial court. *Ratti*. Some rebuttal evidence may be offered as a matter of right, while other rebuttal evidence, even evidence which should have been given in the case-in-chief, can be admitted within the discretion of the trial court, provided that the action of the court is not arbitrary or capricious. *Mitchell v. Gravely International, Inc.*, 698 A.2d 618 (Pa.Super.1997). Because the rebuttal testimony was offered to discredit GM's expert, the trial court did not abuse its discretion by allowing that rebuttal testimony into evidence. Even if the rebuttal testimony could have been offered during Plaintiffs' case-in-chief, any error by the trial court's allowance of it into evidence was *de minimis*.

### 4. Presentation of Deposition Testimony

Plaintiffs chose to present videotaped deposition testimony of some of its witnesses at trial by compact disc. GM contends that it should have been allowed to play its counter designations during Plaintiffs' direct examination of each witness instead of at the conclusion of Plaintiffs' designated testimony. The trial court found this contention baseless because GM was also allowed to put its testimony on in the order it chose, just as Plaintiffs did. We agree. The trial court judge has broad discretion in regulating the order in which testimony and evidence is presented. *Commonwealth v. Jones*, 539 Pa. 222, 651 A.2d 1101 (1994), *cert. denied*, 516 U.S. 835, 116 S.Ct. 113, 133 L.Ed.2d 65 (1995). Therefore, the trial court did not abuse its discretion by allowing Plaintiffs to present their witnesses' testimony in the order it deemed was consistent with their planning and preparation.

### 5. Refusal to Grant Mistrial

GM's last contention under this section focuses on the trial court's refusal to grant a mistrial as a result of the testimony from Plaintiffs' expert, John Marcosky. GM alleges that twice during his testimony, Mr. Marcosky raised a new and previously undisclosed theory of defect—that the door latches on the Harsh vehicle were defective; however, the trial court did not grant a mistrial, but only directed the jury to disregard his testimony regarding an alleged defect in the door latching mechanism. GM argues that Mr. Marcosky's mentioning of the door latches being defective was deliberate and prejudicial, and it was insufficient to only instruct the jury to ignore Mr. Marcosky's remarks rather than to grant a mistrial.

A mistrial is only appropriate where the occurrence is so inflammatory and prejudicial so as to preclude a fair trial and to have undoubtedly influenced the jury, distracting the minds of the jurors from the pivotal issue and influencing their verdict. *Commonwealth v. Brown,* 544 Pa. 406, 676 A.2d 1178 (1996), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996). In evaluating whether a request for a mistrial is manifestly unreasonable, the record must be reviewed to fully appreciate the testimony in the context in which it was made and any subsequent remedial actions designed to remove any prejudicial effects. *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000).

Here, Mr. Marcosky first mentioned defective door latches during direct examination when he was testifying about GM's crash test at which time the rear left door of the car opened. At that time, the trial court gave a cautionary instruction intended to cure any prejudice stemming from the comment and directed the jury to disregard the testimony regarding an alleged defect in the door latching mechanism as well as the testimony about the crash test. The jury was explicitly told that there was no issue in the case regarding an alleged defect in any door on the Harsh vehicle. Then, when Mr. Marcosky was called on rebuttal to impeach the testimony of one of GM's expert, he stated that if crash testing was performed, it would have to be done with the car doors open because the rear doors of the Harsh vehicle were open at the time of the second impact, and the open doors changed the car's crush characteristics. Mr. Marcosky did not mention any defect in the latching mechanism. At that time, the trial court offered to give the jury another cautionary instruction, but GM declined the offer.

Our review of the alleged wrongdoing and the trial court's handling of that matter is that there has been no prejudice to GM. The jury was made aware by the trial court that there was no new defect theory in the case, i.e., that the door latch defect was not at issue in the case. Also, when Mr. Marcosky responded on rebuttal by mentioning the doors but not the door latches, and the trial court asked GM if a cautionary instruction was warranted, GM declined the offer. If GM was so worried about being prejudiced by the mention of the word "doors," they would have jumped at the trial court's offer to caution the jury once again. In any event, because Mr. Marcosky only mentioned the alleged defect once and the jury was properly cautioned that it was not an issue in the case, GM was not prejudiced by the trial court's refusal to grant a mistrial.

### I. "Corporate Mentality" Evidence

GM contends that the trial court erred by allowing certain evidence in on the basis of relevance, attorney-client privilege and the work product doctrine. This evidence, referred to as "corporate mentality" evidence, was presented by Plaintiffs relevant to their claim for punitive damages to demonstrate GM's emphasis of cost considerations over safety in the development of fuel systems. It consisted of: 1) a document referred to as the "Abstract of Presentation;" 2) the "Ivey Value Analysis;" and 3 documents authored by GM's counsel (referred to as Documents 210 and 213).

In its decision, the trial court states that because all of the above-mentioned evidence was only relevant to Plaintiffs' claim for punitive damages and was not introduced for purposes of establishing Plaintiffs' claim of a design or manufacturing defect against GM, and because the jury found in favor of GM on the issue of outrageous conduct and did not award pu-

nitive damages, GM does not have an appealable issue. However, even if it does, the trial court believes all of the evidence was properly admitted. Even though punitive damages were not awarded, if we find that the trial court improperly allowed any of the above-mentioned evidence in for purposes of determining punitive damages, we must then determine whether that evidence was so damaging so as to taint the rest of GM's case, thereby warranting a new trial.

### 1. Abstract of Presentation

"The Abstract of Presentation on Fuel System Integrity" was authored by GM engineer Ronald Elwell and GM attorney James Steger in 1972. The purpose of the Abstract was: 1) to review data concerning post-collision fuel-fed fires for the purpose of developing improved safety criteria to be followed at GM for real world accidents; and 2) to determine the level of fuel system performance to assist GM in its defense of product liability lawsuits. "The Abstract concludes with the recommendation that General Motors design and build its fuel systems such that in the event of a collision, the system's integrity outperforms the integrity of the occupant-protected area of the car. In this manner, conclude the authors, people will survive automobile accidents only to be burned alive by faulty fuel systems." (Trial court decision at 20.)

 GM contends that the Abstract is protected by the attorney-client privilege [24] because it was created at the request of Frank Allen, an attorney on GM's legal staff at the time of its creation.[25] Plaintiffs argued that it was prepared at the request of Frank Winchell, vice-president of the engineering staff. The trial court found that because the document had been admitted into evidence in various cases across the country and had been widely disseminated in the public domain, including being published by the National Highway Safety Transportation Administration, any confidential nature of the document had already been compromised. It further stated: "General Motors agreed not to challenge the release of the documents in response to requests under the Freedom of Information Act or their placement in the National Highway Transportation Safety Administration public files. There is simply no longer a protected attorney-client privilege relative to these documents." (Trial court decision at 33–34.)

 In *Commonwealth of Pennsylvania, Department of General Services v. United States Mineral Products Company,* 809 A.2d 1000 (Pa.Cmwlth.2002), we discussed the attorney-client privilege [26] and its importance, stating that "[t]he at-

---

24. In order to invoke the attorney-client privilege, a party must show that the holder of the privilege is or sought to become a client; the person to whom the communication was made is a member of the bar or a subordinate and is acting as a lawyer in connection with the communication and the communication relates to a fact of which the attorney was informed by his or her client without the presence of strangers for the purpose of securing either an opinion of law, legal services or assistance in some legal proceeding. *Joe v. Prison Health Services,* 782 A.2d 24 (Pa. Cmwlth.2001).

25. It also argues that the document is protected by the word product doctrine because it was prepared by a GM attorney.

26. *See* Section 5928 of the Judicial Code, 42 Pa.C.S. § 5928, which provides, in relevant part:

 [i]n a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon trial by the client.

**434**

torney-client privilege is intended to foster candid communications between legal counsel and the client so that counsel can provide legal advice based upon the most complete information possible from the client. (Citation omitted.) The historical concern has been that, absent the attorney-client privilege, the client may be reluctant to fully disclose all the facts necessary to obtain informed legal advice if these facts may later be exposed to public scrutiny." *Id.* at 1028. We went on to explain that "[t]he 'work product rule' is closely related to the attorney-client privilege but is broader because it protects any material, regardless of whether it is confidential, prepared by the attorney in anticipation of litigation." *Id.* The work product doctrine protects mental impressions, conclusions or opinions regarding a defense such as in this case.

██ Assuming that GM did not waive its attorney-client privilege and did not oppose any requests under the Freedom of Information Act, while Plaintiffs argue that once the document was made public by whatever means, i.e., through the internet or via other court cases involving GM, it was no longer confidential, we do not believe that the breach of the privilege alone is sufficient because it would encourage and reward attempts to garner information in this fashion. In this case, because the document has been widely disseminated, i.e., other courts have allowed this Abstract into evidence and it has been published by the National Highway Safety Transportation Administration, there is no question that the confidential

nature of the document has been lost.[27] Consequently, we find no error by the trial court allowing this document into evidence.

### 2. Ivey Value Analysis

The Ivey Value Analysis is a two-page memorandum that was authored by GM engineer Edward Ivey (Ivey) on June 29, 1973, titled "Value Analysis of Auto Fuel Fed Fire Related Fatalities." Essentially, it was a cost-benefit analysis which calculated the cost to GM of preventing each fatality per year resulting from accidents with fuel-fed fires. Ivey calculated that cost at $2.40 per vehicle for existing vehicles in operation and a decreased cost of $2.20 for new model vehicles yet to be built. GM argues that document only recorded Ivey's hypothetical calculation of the cost of preventing post-collision fuel-fed fires and has no relevance to Plaintiffs' claim for design or manufacturing defects or punitive damages. GM points out that Ivey had no connection whatsoever to the design or manufacturing of the Lumina's fuel system or of any other car's fuel system in 1973 or in 1995. Further, the memorandum was written 22 years before the Harsh vehicle was built, and there is nothing in the 1973 analysis that is in any way relevant to the 1995 Lumina or GM's "corporate mentality" relative to the design or manufacturing of the 1995 Lumina. GM wants us to note that courts in other jurisdictions have excluded the document, finding no nexus between design decisions made by GM and those trials.[28]

**27.** If the document had not been published or made public by other GM cases, had only been obtained by Plaintiffs by some other means, and this issue was arising for the first time, our decision might be different.

**28.** At p. 31 of GM's brief, ftnt. 14, it refers to three other trials in which the Ivey Value Analysis was excluded from evidence: *Trolen-*

*berg v. General Motors Corporation,* No. 92–L–14245 (Cook County, Ill.1998); *Meenach v. General Motors Corporation,* No. 93–201 (E.D.Ky.1995); *Kibler v. General Motors Corporation,* No. C94–149 R (W.D.Wash.1997). In each case, GM indicates that the document was excluded because the trial court did not find that it had any bearing on GM's decision

■ The trial court, however, found that the 1973 memorandum was relevant because Plaintiffs claimed Ivey was instrumental in GM's fuel system design decisions in 1973, even though GM insisted that the report was unauthorized, unrequested and undistributed. Although GM now argues that the Ivey Value Analysis was a protected document under the attorney-client privilege, and the trial court determined that there was nothing about the document which made it privileged, thereby allowing it into evidence, the attorney-client privilege is not even at issue because the document has absolutely no relevance to the 1995 Lumina which is at issue. Even if Ivey was part of GM's design team in 1973, the Lumina was not designed in 1973 and certainly was not manufactured until 1995. However, there is no evidence that GM relied on this analysis when building the 1995 Lumina. Consequently, the trial court erred by allowing the Ivey Value Analysis into evidence.

### 3. Documents 210 and 213

■ GM also argues that Documents 210 and 213 were improperly allowed into evidence. Document 210 consisted of notes taken by a GM lawyer who interviewed Ivey regarding his value analysis and Document 213 was a memorandum summarizing an interview session prepared by another GM lawyer. Essentially, the gist of the notes indicated that, contrary to Ivey's testimony over the last 17 years in at least 12 other post-collision fuel-fed fire cases against GM in which he could not recollect why he prepared the value analysis, he told the GM lawyer that the analysis was prepared for Oldsmobile management and was circulated to representatives of Oldsmobile and the purpose of the analysis was to assist GM in how much they could spend on fuel systems.

making process with regard to the car in

Initially, the trial court found that these documents were protected under the attorney-client privilege. However, after other courts around the country stripped these precise documents of their legal protections in similar cases, the trial court found that the attorney-client privilege was waived because the notes had been largely disseminated to the point where they were available to the public over the internet. Finding that the attorney-client privilege could be waived where it was contrary to the interests of justice, *Cohen v. Jenkintown Cab Company*, 238 Pa.Super. 456, 357 A.2d 689 (1976), and the documents were easily available to Plaintiffs, the trial court allowed Documents 210 and 213 into evidence. However, because the Ivey Analysis was improperly entered into evidence even though it was irrelevant, these documents should also have been excluded for that same reason.

■ Although the trial court erred by allowing into evidence the Ivey Value Analysis and Documents 210 and 213 relative to the issue of punitive damages, the question still remains whether this error tainted the rest of GM's case relative to the jury's award of compensatory damages so as to necessitate a new trial. "Attempting to decide what factors may have influenced the jury's decision is difficult for us to do. For this reason, review of a motion for a new trial is initially made by the trial court. We will reverse that court's decision only where there is an abuse of discretion." *Nelson v. All American Life & Financial Corp.*, 889 F.2d 141, 151 (8th Cir.1989). Therefore, we must determine to what extent the compensatory damages were adversely influenced by the punitive damages evidence.

■ In this case, in addition to the Ivey Analysis and Documents 210 and 213,

question at the trial.

the jury heard and viewed evidence regarding GM's involvement in the Harsh's deaths consisting of numerous exhibits/diagrams, reports, photographs and testimony by experts on both sides. Although this appeal only dealt with post-trial motions that mentioned specific and limited evidence, the other evidence presented at trial relative to the strict liability claim included a mountain of evidence unrelated to the punitive damages claim. Because the documents in question were only a small part of the entire case that Plaintiffs put on against GM and which GM defended against, we do not believe that the trial court's erroneous allowance of the Ivey Analysis and Documents 210 and 213 into evidence tainted the jury's ability to decide whether to award compensatory damages for design or manufacturing defects against GM based on their admission. The fact that the jury did not award punitive damages based on the Ivey Analysis and Documents 210 and 213 is a strong indication that the jury was not adversely influenced by these documents in making an award. *See e.g. Nottingham v. General American Communications Corporation*, 811 F.2d 873 (5th Cir.1987), *cert. denied*, 484 U.S. 854, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987) (remarks by counsel did not appeal to local prejudice against New Yorkers nor sway the jury as shown by jury's decision not to award punitive damages but only to award damages related to production and exploitation of children's educational videos). Had they been prejudiced by the documents, they surely would have awarded punitive damages. For these same reasons, we do not believe that GM was prejudiced by the trial court's admission of evidence of changes in the manufacturing process admitted for purposes of feasibility relative to the strict liability claim. Consequently, we do not believe that GM was so prejudiced by their admission to require a new trial.

## J. Instructions to Jury, Breakdown of Recoverable Damages, Choice of Verdict Slip

### 1. Instructions to Jury

GM first contends that the trial court erred in instructing the jury that a manufacturer has a duty to design against all foreseeable accidents because no court in Pennsylvania has ever held that cars must be designed to withstand every foreseeable accident as foreseeability is a negligence concept. However, contrary to GM's contention, the trial court never instructed the jury on the duty of a car manufacturer to design against all foreseeable accidents, but rather that in the event of a foreseeable accident, a vehicle had to be designed to provide every element necessary to make it safe. The trial court specifically charged the jury as follows:

> The manufacturer is not held to a standard or duty of guarding against all possible types of accidents and injuries, nor does the law hold a manufacturer responsible for every injury suffered by every individual who uses a product.

(Trial transcript, June 19–20, 2001, Volume 18.)

GM argues that the jury should have been instructed that motor vehicle manufacturers have a legal duty to design and manufacture its product to be reasonably crashworthy, but those instructions were rejected by the trial court. However, the trial court properly rejected GM's instructions determining that the concept of duty was "a negligence concept and plaintiffs did not seek a recovery on a negligence theory. Instead, I instructed the jury on the law of Pennsylvania regarding a product liability claim. To the extent that there is a 'duty,' it would involve a manufacturer's 'duty' to design, manufacturer or

distribute a product which is free from defects." (Trial court's opinion at 44.)

■ GM also takes issue with the trial court's instruction to the jury that a manufacturer is a guarantor of its product rather than an insurer of its product and its reliance upon *Azzarello v. Black Brothers Company, Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978). In *Azzarello*, the Supreme Court stated the following regarding a manufacturer acting as a guarantor of its product's safety:

> Today ... a manufacturer ... is effectively the *guarantor of its product's safety* ... Our courts have determined that a manufacturer, by marketing and advertising its product, impliedly represents that it is safe for its intended use. For the term guarantor to have any meaning in this context the [manufacturer] must at least provide a product which is designed to make it safe for the intended use. Under this standard, in this type case, the jury may find a defect where the product left the [manufacturer's] control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use. (Emphasis added.)

*Id.* at 1026–1027. Clearly, because the trial court was bound by our Supreme Court's decision, it properly instructed the jury regarding GM's role as a manufacturer in a product liability case.

## 2. Breakdown of Recoverable Damages

■ GM also objects to the breakdown of recoverable damages that allowed the jury to award damages for the Harsh's mental and emotional distress separate from the damages awarded to Plaintiffs for the Harsh's pain and suffering.[29] Under 42 Pa.C.S. § 8302, all causes of action survive the death of the plaintiff. Therefore, damages are those which the decedent would have been able to seek had he or she lived, including damages for mental pain and suffering as well as physical pain and suffering.

■ Here, there was sufficient evidence presented by Dr. Ross, the forensic pathologist who performed the autopsies, that Douglas, Connie and Tyler Harsh survived the impact from the tractor trailer and died as a result of the fire.[30] Dr. Ross testified that the Harshs all had conscious pain and suffering before their deaths. Several eyewitnesses testified that they heard screaming from inside the car and Petroll and at least one other witness testified that they saw movement in the car by Mrs. Harsh. The trial court noted in its decision that the emergency team that ex-

---

**29.** The jury awarded Plaintiffs the following damages for mental and emotional distress: Douglas Harsh: $750,000; Connie Harsh: $750,000; and Tyler Harsh: $250,000.

**30.** At trial, Dr. Ross testified that the Harsh family members would have survived the accident if not for the fire, stating that their injuries just from the impact of the tractor trailer hitting their car were not so severe as to be life threatening. He unequivocally stated that it was the fire that caused their deaths. (Notes of testimony at 417b, Vol. 4, p. 703.) Dr. Ross detailed that solely from the impact of the tractor trailer, Mr. Harsh suffered some hemorrhaging around his chest cavity and swelling to the brain and inside the lungs, which was most likely caused by the air bag deploying. As to Mrs. Harsh, he stated that she suffered a broken clavicle, her chest plate was partially broken, and she had some bruising around her lower hip area where her lap belt was located. She also had some swelling to her head and lungs caused by her seat belt and air bag. Dr. Ross noted that when smoke entered the body, it also caused the brain and lungs to swell. Finally, regarding Tyler Harsh, Dr. Ross stated that he suffered a fractured jaw. (Reproduced Record at 262a–264a.)

tracted the charred remains of Douglas and Connie Harsh found them holding hands. "To say that there was no evidence of mental and emotional distress in this case borders on a lack of candor with the court." (Trial court's decision at 50.) The trial court also pointed out that the jury could consider that the Harsh parents were aware of the injuries sustained by their six-month old child even if only for a short time. There is no question that the Harsh parents would be entitled to recover for mental and emotional distress for their awareness of their child's injuries and for their own physical pain and suffering.[31] Consequently, the trial court properly awarded Plaintiffs damages for the Harsh's mental and emotional distress separate and apart from their damages for pain and suffering.

### 3. Verdict Slip

GM argues that the trial court made two errors relative to the verdict slip given to the jury. The first error had to do with the special interrogatories [32] that GM requested the trial court present to the jury on the verdict slip when determining if GM was responsible for the Harsh's deaths. More specifically, GM presented the trial court with the following special interrogatories relative to GM's involvement:

3. Do you find that the design of the fuel system in the 1995 Chevrolet Lumina made the car unsafe for its intended use?

Yes _____ No _____

If you have answered yes, proceed to question 4. If you have answered no, proceed to question 8.

4. Do you find that at the time the 1995 Chevrolet Lumina was sold, there was a feasible and practicable alternative design for the fuel system which would have made the car safe for its intended use?

Yes _____ No _____

If you have answered yes, proceed to question 5. If you have answered no, proceed to question 8.

5. Do you find that a defect in the design of the fuel system in the 1995 Chevrolet Lumina was a proximate cause of the death of:

a. Douglas Harsh Yes _____ No _____

b. Connie Harsh Yes _____ No _____

c. Tyler Harsh Yes _____ No. _____

If you have answered yes to any part of question 5, proceed to question 6. If you have answered no to every part of question 5, proceed to question 8.

6. Do you find that the use of the alternative design proposed by the plaintiffs for the fuel system in the 1995 Chevrolet Lumina would have prevented the death of:

a. Douglas Harsh Yes _____ No _____

b. Connie Harsh Yes _____ No _____

c. Tyler Harsh Yes _____ No _____

If you have answered yes to any part of question 6, proceed to question 7. If you have answered no to every part of question 6, proceed to question 8.

---

**31.** We note that relative to these damages, GM is also again raising the issue of the viability of the total offset method of calculating future earning capacity, but recognizes that the trial court and this court is bound by precedent in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), and is only raising the issue here to preserve its right to appeal to the Supreme Court.

**32.** Special interrogatories are "written questions on one or more issues of fact submitted to a jury. The answers to these are necessary to a verdict." Black's Law Dictionary 1253 (5th ed.1979).

* * *

8. Do you find that the fuel system in the 1995 Chevrolet Lumina had a manufacturing defect which made the car unsafe for its intended use?

Yes _____ No _____

If you have answered yes, proceed to question 9. If you have answered no, proceed to question 12.

9. Do you find that a manufacturing defect in the 1995 Chevrolet Lumina's fuel system was a proximate cause of the death of:

a. Douglas Harsh Yes _____ No _____
b. Connie Harsh Yes _____ No _____
c. Tyler Harsh Yes _____ No _____

If you have answered yes to any part of question 9, proceed to question 10. If you have answered no to any part of question 9, proceed to question 12.

(*See* Proposed Verdict Slip, Appendix to GM's Brief.) Based on our reading of the trial transcript, it appears the trial court judge took time in considering whether to present these special interrogatories to the jury as requested by GM. However, after deliberating and consulting the *Handbook for State Trial Judges* published by the Pennsylvania Conference of State Trial Judges, the trial court judge determined that because Plaintiffs only had to prove that the Lumina was defective, a general verdict would be more appropriate. As a result, the verdict slip that was presented to the juror simply asked the following questions relative to GM's culpability:

**Question 4:**

Do you find that there was a defect in the 1995 Chevrolet Lumina owned by Douglas and Connie Harsh?

Yes _____ No _____

If you answer "yes" to Question 4, proceed to Question 5.

If you answer "no" to Question 4, proceed to Question 6.

**Question 5:**

If you find that there was a defect in the 1995 Chevrolet Lumina owned by Douglas and Connie Harsh, was that defect a substantial factor in causing the deaths of the Harsh family on April 21, 1995?

Yes _____ No _____

Proceed to Question 6.

The trial court judge more fully explained his reasoning in his opinion, stating:

Under the law of Pennsylvania, the plaintiff is required to prove only that the product was defective. The plaintiffs in this case presented credible and substantial evidence from which the jury could have concluded that the Harsh Lumina contained a manufacturing defect or a design defect or both. These are alternative theories which the jury can consider when deciding the basic question of whether the product was defective. There is no requirement in the law that the jury specify how it came to the conclusion that the vehicle contained a defect.

I note that in the *Handbook for State Trial Judges* published by the Pennsylvania Conference of State Trial Judges there is a discussion of special verdicts in civil jury trials. The *Handbook* notes:

"We have a history of not permitting attacks on a verdict on the basis of evidence concerning jury deliberations because we are not interested in how the jury got to a result that the evidence supports ... Since this is a group process, a jury may not do a good job in explaining how ten of the twelve jurors arrive at a final decision that the evidence will support. We weaken the right of the parties to have their case decided by a jury rather than by a judge if we use a

structure that is designed to evaluate the process by which the jury decided a case." *Handbook for State Trial Judges,* "Management of Civil Jury Trials," Pennsylvania Conference of State Trial Judges, First Edition. (Trial court's opinion at 48.) GM contends that the jury was left with the impression that liability could be imposed on GM based upon a finding of defective design and a finding of causation; but liability for failure to design a crashworthy car also requires a finding that a safe alternative design was available, and the trial court's failure to provide the jury with the special interrogatories eliminated the alternative design element under the crashworthiness portion of the design defect claim.

A party is not entitled by right to have special interrogatories submitted to a jury. *Fisch's Parking, Inc. v. Independence Hall Parking, Inc.,* 432 Pa.Super. 263, 638 A.2d 217 (1994), *petition for allowance of appeal denied,* 542 Pa. 669, 668 A.2d 1132 (1995). The decision whether to submit special interrogatories to a jury is a ruling left to the discretion of the trial court. *Henery v. Shadle,* 443 Pa.Super. 331, 661 A.2d 439, *petition for allowance of appeal denied,* 542 Pa. 670, 668 A.2d 1133 (1995). The trial court judge may grant or refuse a request for special interrogatories on the basis of whether they would add to the logical and reasonable understanding of the issues. *Century 21 Heritage Realty, Inc. v. Bair,* 386 Pa.Super. 373, 563 A.2d 114 (1989). Requests for submission of special interrogatories to a jury have been denied where the issues were neither complex nor lengthy. *See Moran ex rel. Estate of Moran v. G. & W.H. Corson, Inc.,* 402 Pa.Super. 101, 586 A.2d 416 (1991), *petition for allowance of appeal denied,* 529 Pa. 650, 602 A.2d 860 (1992). Here, the trial court judge determined that special interrogato-

ries were not necessary because all that Plaintiffs had to prove was that the Lumina was sold in a defective condition and caused the harm, and it did not matter if the jury came to that conclusion based on a finding that it was a manufacturing defect or a design defect or both. *See Phillips v. A–Best Products Company,* 542 Pa. 124, 665 A.2d 1167 (1995). In this case, because the ultimate question, after all, was whether the product was defective, it was not an abuse of discretion for the trial court judge to refuse GM's request to submit the special interrogatories to the jury.

GM's second contention regarding the verdict slip is that the trial court erred in submitting the verdict slip that it did to the jury because it did not differentiate between Plaintiffs' two theories of defect—design and manufacturing—and there was no way to determine under which theory all 12 jurors unanimously agreed that GM was liable. "A minority, convinced that the Lumina possessed only a manufacturing defect, and a similar group convinced that the Lumina exhibited only a design defect, could have combined to form the majority favoring liability. The anomalous effect would be that plaintiffs, unable to prevail on the existence of either defect considered alone, could have prevailed because the court's special interrogatory lumped them together. With the basis for the jury's verdict undeterminable, and potentially unsupportable, a new trial is the appropriate remedy." (GM's brief at 42.)

While GM presents an interesting argument, we cannot say that the trial court abused its discretion by presenting only one question about whether the product was defective. As pointed out previously, Plaintiffs did not have to prove that the Lumina was defective under a particular theory of strict liability, but only that the Lumina was sold in a defective condition

and caused the Harsh's deaths.[33] Regardless of whether the Lumina was designed improperly or manufactured improperly, in this case, the jury determined that the Harshs died as a result of a **defective GM product.** Consequently, the trial court did not err with regard to the verdict slip.

Accordingly, the decision of the trial court denying GM's post-trial motions is affirmed.

## II.

### PETROLL DEFENDANTS' APPEAL

#### A. Apportionment of Damages

■ The Petroll Defendants contend that they are entitled to a new trial because the damages in this case were clearly divisible, that they should have been apportioned respectively, and that they should not have been held jointly and severally liable with GM for the full amount of the judgment. They point out that Plaintiffs' claims against them were for negligence in causing the initial collision, while Plaintiffs' claims against GM were for the enhanced injuries the decedents suffered based on the lack of crashworthiness of the Lumina, a products liability theory. Because the claims against the separate defendants were premised on negligence and crashworthiness and the injuries were capable of being separated, as evidenced by the forensic expert's testimony that the

Harsh family would not have died from their injuries resulting solely from the impact and only died from the fire that was caused by GM's defective car,[34] the Petroll Defendants allege that they and GM cannot be joint tortfeasors.[35]

The trial court disagreed with the Petroll Defendants when they made this argument in their post-trial motions finding that the harm caused by them and GM was a single, indivisible harm—death—and that both parties contributed to that harm. It stated that Dr. Ross's testimony was not offered to clear the Petroll Defendants of responsibility for the deaths of the Harsh family, but instead, was offered to establish their shared responsibility with GM for the three deaths. In doing so, the trial court relied upon *Stecher v. Ford Motor Company (Stecher I)*, 779 A.2d 491 (Pa.Super.), *petition for allowance of appeal granted*, 568 Pa. 619, 792 A.2d 1254 (2001), *vacated and remanded*, 571 Pa. 312, 812 A.2d 553 (2002) (*Stecher II*), in which the Superior Court considered apportionment of liability among multiple defendants.[36]

In that case, Stecher suffered a brain injury in a collision with another car. She brought suit against Ford Motor Company (Ford), the manufacturer of her car, alleging a defect in the "B" pillar of her car that struck her following the collision with the other car. The trial court in *Stecher* found that Stecher was required to first

---

**33.** Prior to the jury retiring to deliberate, the trial court did, in fact, explain all of the aspects of the strict liability case, stating:

> Now there are basically three different aspects of the defect theory in this case. One is a manufacturing defect; the other is a design defect; and the third is what is called crashworthiness, which is an aspect of the design defect theory.

The trial court judge then went on to explain in detail each of the different aspects. (Notes of testimony, Volume 18 at 2706–2709.)

**34.** *See* ftnt. 29 *supra.*

**35.** Joint tortfeasors are defined as "[t]hose who act together in committing wrong, or whose acts if independent of each other, unite in causing single injury." Black's Law Dictionary 753 (5th ed.1979).

**36.** The trial court issued its opinion on June 25, 2002, and the *Stecher II* decision, overruling *Stecher I*, was issued on December 19, 2002.

prove that the alleged defect was a substantial factor in causing her damages beyond those which were caused as a result of the collision with the other vehicle, after which the burden shifted to Ford to quantify the extent of Stecher's injuries caused by the defect in its car.

On an appeal by Stecher, the precise issue was the propriety of the trial court's instructions regarding a plaintiff's burden of proof under the enhanced injury doctrine in a crashworthiness case. The Superior Court utilized the *Fox/Mitchell* approach which referred to two federal court decisions: *Fox v. Ford Motor Company*, 575 F.2d 774 (10th Cir.1978) (predicting Wyoming law) and *Mitchell v. Volkswagenwerk, AG*, 669 F.2d 1199 (8th Cir. 1982) (predicting Minnesota law). This approach required a plaintiff to prove only that a defect "was a substantial factor in producing damages over and above those which were probably caused as a result of the original impact or collision." *Mitchell*, 669 F.2d at 1206. If the plaintiff did so, the burden of proof shifted to the tortfeasors to apportion the damages between them. *Stecher I*, 779 A.2d at 495. If the defect was "found to be a substantial factor in causing an indivisible injury such as paraplegia, death, etc., then absent a reasonable basis to determine which wrongdoer actually caused the harm, the defendants" were to be treated as joint and several tortfeasors. *Mitchell*, 669 F.2d at 1206. Also relying on Section 16 of the Restatement (Third) of Torts,[37] the Superior Court found that the trial court erred in instructing the jury that Stecher bore the burden of quantifying the extent of the enhanced injuries caused by the alleged defect in the Ford vehicle and remanded the matter for a new trial. Stecher appealed.

Concluding that because the jury found the issue of whose burden it was to prove the extent of enhanced injuries attributable to the product defect was moot because the defect in the Ford was not a substantial factor in causing *any* of Stecher's injuries, our Supreme Court vacated and remanded the Superior Court's decision in *Stecher I*. It specifically noted that "because the Superior Court erroneously addressed the issue, its determination as to the adoption of the *Fox/Mitchell* approach should be regarded as mere *dicta.*" *Stecher II*, 571 Pa. at 320, 812 A.2d at 558, n. 5. Consequently, we cannot follow the trial court's decision on this issue based on its reliance on *Stecher I* because it is not precedential.

The Petroll Defendants argue that we should rely upon *Carrasquilla v. Mazda Motor Corporation*, 963 F.Supp. 455 (M.D.Pa.1997), a district court case holding

---

**37.** Section 16 of the Restatement (Third) of Torts provides the following:

(a) When a product is defective at the time of commercial sale or other distribution and the defect is a substantial factor in increasing the plaintiff's harm beyond that which would have resulted from other causes, the product seller is subject to liability for the increased harm.

(b) If proof supports a determination of the harm that would have resulted from other causes in the absence of the product defect, the product seller's liability is limited solely to the product defect.

(c) If proof does not support a determination under Subsection (b) of the harm that would have resulted in the absence of the product defect, the product seller is liable for all of the plaintiff's harm attributable to the defect and other causes.

(d) A seller of a defective product that is held liable for part of the harm suffered by the plaintiff under Subsection 9(b), or all of the harm suffered by the plaintiff under Subsection (c), is jointly and severally liable or severally liable with other parties who bear legal responsibility for causing the harm, determined by applicable rules of joint and several liability.

that "when claims against separate defendants are premised on negligence and crashworthiness, the causes of action are separate because the injuries are mutually exclusive, and the manufacturer and the negligent driver can never be joint tortfeasors." *Id.* 963 F.Supp. at 459. Applying that holding to this case, the Petroll Defendants contend that they and GM are not joint tortfeasors because the injuries caused by the original impact and the injuries caused by the defective vehicle, i.e., death, were severable. The decedents would not have died as a result of the original accident, i.e., the impact from the tractor trailer, and they did, in fact, die only because of the injuries resulting from the defective GM vehicle after the initial impact. While *Carrasquilla* is certainly compelling, this Court is not bound to follow district court cases. Instead, we choose to rely on our appellate courts for direction.

In *Svetz v. Land Tool Company*, 355 Pa.Super. 230, 513 A.2d 403 (1986), *petition for allowance of appeal denied,* 515 Pa. 584, 527 A.2d 544 (1987), the Superior Court addressed the issue of contribution among joint tortfeasors when, just as here, one defendant was sued based on negligence and another on strict liability. In *Svetz,* a motorcyclist, after being served alcoholic beverages at an inn despite being visibly intoxicated, was riding his motorcycle when he lost control and hit his head on the pavement causing the helmet to split and him to sustain head injuries leading to his death. Among others, his estate sued the manufacturer of the helmet and the inn that served him the alcoholic beverages. The Court held that "defendants who are liable under principles of strict liability and defendants who are liable because of negligence may be joint tortfeasors." *Id.* at 408. It stated: "It follows of necessity that where strictly liable and negligent defendants have acted as joint tortfeasors, contribution among them can be properly awarded." *Id.*

 Based on this holding, as well as the reasoning set forth in *Stecher I,* damages were not divisible and the Petroll Defendants were joint tortfeasors with GM.

## B. Collateral Estoppel

 In 1996, Mr. Petroll was convicted of three counts of homicide by vehicle, driving a vehicle at an unsafe speed, and careless driving. At the end of the civil trial, GM moved for a directed verdict regarding its own cross claims and to Plaintiffs' direct claims against the Petroll Defendants based on the doctrine of collateral estoppel.[38] The trial court granted a directed verdict against the Petroll Defendants as to negligence and causation. In its opinion, the trial court states that in order to convict Mr. Petroll:

> [T]he Commonwealth was required to prove beyond a reasonable doubt that he acted with criminal negligence. *Commonwealth v. Heck,* 517 Pa. 192, 200–01, 535 A.2d 575, 577 (1987). This is a more culpable state than mere civil negligence and required a showing that the defendant's conduct was a "gross deviation" from the standard of care established by

---

38. "Collateral estoppel is used offensively when the 'plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party.' " *Shaffer v. Smith,* 543 Pa. 526, 529, 673 A.2d 872, 874 (1996). "[A] plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merit, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." *Id.*

the underlying traffic regulation which was alleged to have been violated. *Id.* The Commonwealth also had to prove that the defendant's violation of that traffic regulation **was the cause of the victim's death.** *Id.* at 197, 535 A.2d at 578; *Commonwealth v. Field,* 490 Pa. 519, 525, 417 A.2d 160, 163 (1980). The jury returned a verdict which indicated that the Commonwealth had met its burden of proving beyond a reasonable doubt that: (1) Mr. Petroll violated his duty to drive safely; and (2) this violation was the cause of the victims' deaths.

(Trial court's opinion at 95.)

The Petroll Defendants now argue that the trial court erred by entering a directed verdict against them on the basis of Mr. Petroll's criminal conviction as it related to causation.[39] In conjunction with that argument, they again contend that the jury did not address the issue of whether the injuries suffered by decedents were capable of being apportioned.

 Prior criminal convictions are conclusive evidence in subsequent civil actions arising out of the same incidents and concerning the same activity which was criminally prosecuted in the prior action. *Folino v. Young,* 523 Pa. 532, 568 A.2d 171 (1990) (conviction for driving at unsafe speed admissible and conclusive of defendant's negligent operation of motor vehicle in subsequent civil action arising out of same collision where driving at unsafe speed conviction formed basis of defendant's conviction for homicide by vehicle for death of passenger). Once a criminal defendant has been convicted and sentenced, a plaintiff in a civil proceeding may invoke the doctrine of collateral estoppel to preclude the defendant from denying his criminal acts. *Shaffer.* While we recognize that the evidence in this case presents an anomalous situation where another party was the cause of the deaths, at least as to Mr. Petroll, once the jury found Mr. Petrol guilty of vehicular homicide in the previous trial, his conviction was conclusive evidence in this trial that his actions caused the deaths of Douglas, Connie and Tyler Harsh and the jury in this case did not need to determine whether damages could be apportioned.

## C. Delay Damages

The trial court awarded delay damages against the Petroll Defendants finding that their insurance carrier, Zurich–American Insurance Company (Zurich), had made an offer of $1 million not only to the Plaintiffs but also to all of the injured parties and had conditioned their offer on the Plaintiffs and all of those other individuals agreeing on the distribution of the $1 million and on providing a proper release to Zurich. The trial court concluded that based on those conditions, no bona fide offer was ever made that comported with the requirements of Rule 238. The Petroll Defendants, however, contend that they made a bona fide settlement offer of $1 million to Plaintiffs prior to trial in writing under their Zurich insurance policy, and the fact that they conditioned it upon the Plaintiffs and other injured parties agreeing did not make the offer invalid because Petroll is indigent and have nothing else to offer the Plaintiffs or other injured parties.[40]

 We addressed the issue of settlement offers in *Teamann v. Zafris,* 811

---

**39.** They do not dispute the directed verdict as it related to the negligence action.

**40.** The June 14, 1996 letter set to Plaintiffs stated in pertinent part:

> Once all parties can agree on the distribution of [the $1 million], and a proper release for our insured has been received, Zurich–American will pay the policy limits.

A.2d 52 (Pa.Cmwlth.2002), *petition for allowance of appeal denied*, —— Pa. ——, 830 A.2d 976 (2003), holding that a settlement offer conditioned upon other plaintiffs in the suit agreeing to accept the settlement offer was invalid and not a full offer of settlement as contemplated by Rule 238. In *Teamann*, delay damages were awarded after Richard Jerrell, a driver of a truck owned by Skip's Contracting, hit the rear of a car causing a five-car collision resulting in numerous injuries, including the deaths of two children who burned to death in the car driven by their grandparents. Jerrell and Skip argued that Rule 238 delay damages were not appropriate because the exposure of the claims against them exceeded their liability limits, and their insurance carrier made an offer to the injured parties and the estates of the deceased. More specifically, Nationwide Insurance Company offered its entire policy limit of $100,000 with a suggested allocation among the various claimants, rather than simply offering the policy limits to the claimants as a group. The offer specified: "This agreement would have to be made with collective approval from all parties involved." *Id.* at 59. On appeal, we rejected Jerrell and Skip's argument that they made a bona fide offer, stating the following:

> In this case, the settlement offer was conditioned upon all 12 plaintiffs agreeing to accept specified amounts. Because the offer could not be accepted by any individual plaintiff without the agreement of all of the other plaintiffs, it was invalid. Even though the verdicts in this case were more than the policy limits of Jerrell and Skip's insurance policy, that did not preclude Nationwide, acting on behalf of Jerrell and Skip's from sending each plaintiff a letter indicating that it was offering the full amount of its insured's policy—$100,000—and the parties could divide the

$100,000 as they saw fit. As long as the letter did not condition the acceptance of the offer upon all of the plaintiffs agreeing to accept the offer, it would have been a bona fide offer for purposes of Rule 238. However, the letter was conditional, and, accordingly, was not a bona fide offer.

*Id.* at 60. Because the Petroll Defendants conditioned their offer on the Plaintiffs and all other injured parties accepting their policy limit, that rendered the offer void. Moreover, whether the Petroll Defendants are indigent with nothing more to offer personally above the $1 million policy limit has nothing to do with Zurich's offer. Payment of delay damages to a specific plaintiff cannot be conditioned upon the acceptance of an offer by other injured parties. Zurich could have filed an interpleader action for the entire amount of the Petroll Defendants' policy to protect itself from any further damages against them and the Petroll Defendants could have filed an affidavit of indigency. Neither was done here. Consequently, the trial court properly determined that the Petroll Defendants had not made a bona fide settlement offer.

Accordingly, for all of the above reasons, the trial court properly denied the post-trial motions of the Petroll Defendants.

## ORDER

AND NOW, this *10th* day of *December*, 2003, the order of the Court of Common Pleas of Lancaster County dated February 5, 2002, is affirmed.