Dora HOOKER, Administratrix of
the Estate of Ethel Murray,
Deceased, Appellant

v.

STATE FARM FIRE AND CASUALTY
COMPANY.

Ethel Murray

v.

City of Philadelphia and Fayette Street
Corporation (Three Cases).

Dora Hooker, Administratrix of the
Estate of Ethel Murray,
Deceased,

v.

State Farm Fire and Casualty
Company

Appeal of: Fayette Street Corporation.

Dora Hooker, Administratrix of the
Estate of Ethel Murray,
Deceased,

v.

State Farm Fire and Casualty
Company, Appellant.

Commonwealth Court of Pennsylvania.

Argued June 6, 2005.
Decided Aug. 4, 2005.

Patricia J. Cooney, Philadelphia, for designated appellant, Dora Hooker.

D. Scott Bonebrake, Media, for appellee, Ethel Murray.

Glen H. Ridenour, II, Philadelphia, for appellee, Fayette Street Corp. and City of Philadelphia.

Yolanda K. DeSipio, Morrisville, for appellee, State Farm Fire and Casualty Company.

BEFORE: SMITH–RIBNER, J., LEAVITT, J., and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

Dora Hooker (Hooker), Administratrix of the Estate of Ethel Murray (Murray), Deceased, appeals from two orders of the Court of Common Pleas of Philadelphia County (trial court) dated March 15 and 16, 2004. The March 15, 2004 order denied Hooker's motion for prejudgment interest on jury awards rendered in Hooker's favor on March 17, 2003 and against State Farm Fire and Casualty Company (State Farm) and Fayette Street Corporation (Fayette) (collectively, Defendants); the March 16, 2004 order denied Hooker's motion for post-trial relief in the nature of a motion for additur on the jury award rendered in Hooker's favor and against State Farm on a breach of contract claim.

State Farm and Fayette appeal from the trial court's March 16, 2004 order that denied their post-trial motion in the nature of a motion for new trial or in the alternative, a motion for judgment notwithstanding the verdict. By order dated March 8, 2005, this Court consolidated the appeals for disposition.[1] We vacate and remand for a new trial.

Murray, now deceased, and Hooker, her daughter, resided at 6115 Delancey Street, Philadelphia, Pennsylvania. Their home, described as a row house, shared a common wall with 6113 Delancey Street. In 1998, the City initiated court proceedings to have the structure at 6113 Delancey Street demolished. Upon obtaining judicial authorization, the City engaged Fayette to demolish 6113 Delancey. The demolition was completed by mid-April 1999.

On April 11, 2001, Hooker commenced a lawsuit against the City and Fayette, alleging that the City was negligent in hiring Fayette to complete the demolition work and, as a result thereof, Hooker sustained sum-specific damages to the building, rooms, and contents of her home. In Count II of her complaint, Hooker alleged that Fayette was negligent in the performance of the demolition which resulted in sum-specific damages to her home.

Hooker filed an amended complaint on December 12, 2001, alleging that the sum of her damages had increased. A second amended complaint was filed on September 6, 2002. Although the allegations of negligence remained unchanged, Hooker included as damages her moving and living expenses after she vacated the home in March of 2001.

Similarly, on October 24, 2001, Hooker commenced a civil lawsuit against State Farm. In that action, Hooker averred that State Farm breached its contract of homeowner's insurance with Murray by failing to pay claims related to damages caused by the demolition of 6113 Delancey.

---

1. The appeals were originally filed with the Superior Court, which transferred the appeals to this Court inasmuch as the City of Philadelphia (City), although dismissed as a party by the trial court on a motion for a directed verdict, is tangentially involved. *See* 42 Pa. C.S. § 762.

Hooker claimed damages not in excess of $50,000.[2] Unlike the action against the City and Fayette, Hooker did not seek to amend her complaint against State Farm. Upon motion, the trial court eventually consolidated the matters for both discovery and trial purposes.

An eight-day jury trial was held beginning on March 5, 2003. The jury returned a verdict in favor of Hooker and against Fayette in the amount of $99,518.41 on the negligence claim and a verdict in favor of Hooker and against State Farm in the amount of $54,022.71 on the breach of contract claim. The trial court denied all parties' post-trial motions from which they now appeal.

### Appeals of State Farm and Fayette[3]

A pivotal issue in Defendants' appeals is whether the trial court erred by refusing to grant their motions for a directed verdict on Hooker's claim for additional living expenses. In March 2001, a month prior to the filing of her original complaint against Fayette and six months prior to her complaint against State Farm, Hooker and Murray vacated the residence. Yet in her original complaint, Hooker failed to claim damages for additional living expenses. It was not until Hooker filed her second amended complaint that she sought damages for additional living expenses against Fayette. She did not list the type of expenses incurred or place a value on them.

■ With regard to State Farm, Hooker's only claim for damages was for *property damage* not in excess of $50,000. She alleged that despite notice and demand for payment, State Farm refused to pay for damages to her property caused by the demolition. The complaint against State Farm, which was never amended, did not seek damages for additional living expenses.

■ Pursuant to Pa. R.C.P. No. 1019(f), averments of time, place and *items of special damages* must be specifically stated. (Emphasis added.) Damages are either general or special. General damages are those that are the usual and ordinary consequences of the wrong done. *Fort Washington Res., Inc. v. Tannen,* 901 F.Supp. 932 (E.D.Pa.1995); *Parsons Trading Co. v. Dohan,* 312 Pa. 464, 167 A. 310 (1933). Special damages are those that are not the usual and ordinary consequences of the wrong done but which depend on special circumstances. *Id.* General damages may be proven without specifically pleading them; however, special damages may not be proved unless special facts giving rise to them are averred. *Laing v. Colder,* 8 Pa. 479 (1848); *Boden v. Gen. Tel. Co.,* 32 Som. 128 (Pa.Com.Pl.1975).

In this case, we cannot ignore Hooker's failure to specifically plead damages attributable to additional living expenses. Although Hooker testified as to her additional living expenses (Fayette S.R.R. 217b–229b), she failed to specifically identify and either itemize or provide a lump sum of those expenses in her complaints. *See Holowka v. York Farm Bureau,* 78 York 121 (Pa.Com.Pl.1963)(special damages must be alleged with particularity and may not be identified together). Thus, she is precluded from any recovery based on her claim for additional living expenses. The trial court therefore committed an error of law

---

2. The matter against State Farm proceeded to arbitration, whereupon the arbitrators found in favor of Hooker. State Farm appealed from that decision to the trial court.

3. Fayette raised issues that are identical to those raised by State Farm. As such, they will be addressed at the same time. Fayette raised additional issues as well, which will be addressed separately.

by failing to grant a verdict in favor of Defendants on the issue of additional living expenses.[4,5]

With that determination, we can agree only in part with Defendants' contention that the trial court erred when it failed to enforce its Case Management Order providing that Hooker's expert reports were to be submitted to Defendants by October 1, 2002. The order further provided that Defendants had to submit their expert reports to Hooker by November 1, 2002. Hooker's expert, Daniel Banks, issued two reports before the discovery deadline: August 20 and September 24, 2001. The first report identified the nature, extent and cause of the structural damage to Hooker's dwelling while the second report estimated the cost and type of repairs that were needed.

Defendants engaged Gary Popolizio as their expert witness. Popolizio issued an amended report just beyond the November 1, 2002 deadline. In that report, Popolizio wrote that he did not observe any conditions of the home that would make it uninhabitable. (Hooker Exhibit 29) In response thereto, Banks issued a report dated December 26, 2002 specifically denying that the home was habitable. His opinion was based on photos of the home showing mold on the basement wall.

Defendants filed a motion in limine objecting to Banks' December 26, 2002 report, which was submitted in early January 2003. On appeal, Defendants contend that they were prejudiced by the trial court's order denying their motion in limine inasmuch as they did not have an opportunity to rebut Banks' report. Claiming that the trial court misunderstood the nature of State Farm's argument, it contends that it was prejudiced by the 2002 report because it did not have an opportunity to examine Hooker's basement for mold in 2001, when it was said to have first spawned. State Farm suggests that an inspection of Hooker's basement in 2003 would have been useless because the conditions of the basement would have substantially changed since March of 2001 when Hooker and Murray vacated the residence.

Insofar as Banks' December 26, 2002 reports offers an opinion as to the *habitability* of the home, the trial court erred by admitting those portions of the report of-

---

4. We reject Hooker's argument that her complaint sought "property damages" and that therefore, her claim for additional living expenses was properly pleaded. Additional living expenses do not naturally flow from the harm done and are properly considered special damages. *See generally*, Goodrich Amram 2d, § 1019(f)(8) (in a claim for extras under a contract, it is sufficient to identify each group of extras and give a lump sum figure for the damages alleged). Furthermore, we find Hooker's contention that State Farm should be held accountable for additional living expenses because it was aware that she intended to seek said damages prior to litigation to be incredulous. Hooker has failed to provide any support for her proposition that because a defendant may be aware of possible claims in a lawsuit, the plaintiff is relieved of the duty to properly plead a cause of action and damages.

5. We are cognizant that Hooker testified that she and her mother moved from the residence because they were afraid to live in the home due to its structural condition. (Fayette S.R.R. 216b; 234b; 351b) While we agree that such a reason would be relevant to the issue of the home's habitability and Hooker's claim for additional living expenses, it remains that she failed to plead her special damages with specificity. Because we conclude that the trial court erred by allowing the jury to consider the issue of damages for additional living expenses, we need not address Defendants' argument that the trial court erred by instructing the jury to use a subjective standard of proof rather than an objective standard of proof on the issue of the dwelling's habitability.

fering such an opinion into evidence. This relates directly to Hooker's claim for additional living expenses which were not properly pleaded. The trial court should have redacted from Banks' December 2002 report any opinions regarding the home's *habitability*.

 Nonetheless, Banks' report included rebuttal to the deposition testimony of Defendants' witnesses as to the workmanship of the demolition. Additionally, Banks' report noted the presence of mold that, aside from the issue of habitability, may have pertained to damages caused by the demolition. "A trial judge has broad powers concerning the conduct of a trial, particularly with regard to the admission or exclusion of evidence." *Micciche v. E. Elevator Co.*, 435 Pa.Super. 219, 645 A.2d 278, 280 (1994). As the trial court noted, Banks' report was issued two months before the matter proceeded to trial and Hooker offered Defendants an opportunity to re-inspect the dwelling. Thus, insofar as Banks' December 26, 2002 report was offered to rebut the testimony of Defendants' witnesses as to the workmanship of the demolition and to establish the presence of mold as an additional damage to the structure, we cannot conclude that the trial court abused its discretion in admitting the December 2002 report for those purposes.

 Defendants further suggest that the trial court erred by permitting Banks to testify as an expert in mold because he did not have the requisite expertise and because his testimony went beyond the scope of his reports.[6] Pennsylvania Rule of Evidence 702 governs expert testimony and provides as follows:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

In *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 480–481, 664 A.2d 525, 528 (1995), the Supreme Court stated that

[t]he standard for qualifications of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required. . . . It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience. (Citations omitted.)

In the present matter, the trial court accepted Banks as an expert in mold for the purposes of identification. The court did not, however, accept Banks as an expert in the area of the effects of mold on humans. (Fayette S.R.R. 412b–413b)

Banks testified that he took a course in microbiology and that he has work experience in the area of mold. (Fayette S.R.R.

6. Defendants did not address the latter contention in their briefs and therefore it is deemed waived. *See Browne v. Commonwealth*, 843 A.2d 429 (Pa.Cmwlth.), *appeal*

denied, 581 Pa. 681, 863 A.2d 1149 (2004) (a party's failure to include analysis and relevant authority results in waiver of issue).

390b–410b) When asked about his experience, Banks stated that mold is a consideration in building examinations insofar as mold is an environmental hazard. He testified that he is required to inspect homes for mold. Additionally, Banks stated that he has worked as a mold tester.

Banks' limited formal education on mold does not hinder his ability to testify as an expert on the identification and causes of mold. His testimony indicates that he has specialized knowledge of mold and its causes which is beyond that possessed by a layperson and that such knowledge would assist the trier of fact. Thus, the standards of Pa. R.E. 702 and *Miller* have been met. Accordingly, we conclude that the trial court did not abuse its discretion in allowing Banks to testify as an expert on the identification of mold.

State Farm next complains that the trial court erred in its response to two questions posed by the jury during deliberations. Although the actual question slips were not preserved nor were the questions verbally stated on the record, it is suggested that the first question asked whether both Defendants could be found negligent and the second question pertained to the damages that could be awarded against both Defendants. The trial court answered the jury's questions as follows:

I want you to take—I want you to look at the sum of $54,022.71. If you find that State Farm breached the contract, you may award [Hooker] anywhere from $1 to 54,022.71. You can't go above that figure.

For example, suppose you said 60,000. I would cut it to 54. Okay? Now, that's the most against State Farm.

Now, keep in mind that you may reject some of those claims. You could give a lesser amount. If you feel [Hooker] did not mitigate damages, or should

have mitigated damages, then you could deduct that amount.

But my point is you can't go above the 54,000. So anywhere from a dollar to 54,000.

Now, that's State Farm.

Okay? Now we have Fayette. All right? There are three figures there. You see the name Gary P. We know that that's Mr. Popolizio, and these are some of the figures he came up with.

And you see 75,000. I'm just going to take the higher numbers. 75,000, 21,000 and $1,562. That total, those totals are 99,518.41.

Now keep in mind Fayette is claiming that [Hooker was] careless. So if you make an award and you also feel [Hooker was] careless[,] I'm going to reduce that award by the percentage of carelessness against [Hooker].

Also Fayette claims ... [Hooker] should have mitigated some of [her] expenses. If you feel [she] should have mitigated some of [her] expenses, you can deduct that sum from the 99,000. Again, your award, if you find Fayette careless, and ...—the carelessness was the cause of the harm could be anywhere from a dollar to $99,518.41.

(State Farm S.R.R. 246b–247b) Additionally, in its charge to the jury, the trial court defined "negligence" as it applied to the claim against Fayette and "breach of contract" as it applied to the claim against State Farm. (State Farm S.R.R. 209b and 211b, respectively)

 A trial court has wide discretion in phrasing jury instructions and our scope of review in examining those instructions is limited to determining whether the court committed a clear abuse of discretion or an error of law that controlled the outcome of the case. *Gaylord ex rel. Gaylord v. Morris Tp. Fire Dep't,* 853 A.2d 1112 (Pa. Cmwlth.), *appeal denied,* 581 Pa. 701, 864

A.2d 1205 (2004). An instruction will be found to be adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." *Id.* at 1116 (quoting *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995)). "A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental." *Id.* In reviewing the trial court's charge to the jury, we must look at the charge in its entirety and not to words or passages taken out of context. *Id.* "In order to obtain a new trial based on the trial court's treatment of a jury's question, the moving party must demonstrate in what way the trial error caused an incorrect result." *Jeter v. Owens–Corning Fiberglas Corp.* 716 A.2d 633, 636 (Pa.Super.1998).

■ Although the trial court did not specifically answer the question of whether both Defendants could be held negligent, the trial court's use of the phrase "[i]f you find that State Farm breached the contract" was sufficient to indicate to the jury that it must consider only whether State Farm breached its contract of insurance with Hooker as that phrase was previously defined in the court's charge. (State Farm S.R.R. 246) The court's answer to the jury question was further clarified when the court continued to address the claim against Fayette. The trial court stated: "If you find Fayette careless and . . . the carelessness was the cause of the harm . . . ." (State Farm S.R.R. 247b) The trial court *did not* use the term "carelessness" when referring to the action

against State Farm. Consequently, we conclude that the trial court's answer to the jury questions was a correct instruction on the law and was adequate to address the jury's questions.

■ Defendants further contend that the trial court erred by allowing Hooker to testify at trial about an estimate that she received from a contractor to support her contention that the home was not habitable. During her direct examination the first day of trial, Hooker testified without objection that she was informed by the City to get an appraisal for repairs and that she obtained an appraisal in the amount of $5,000. (Fayette S.R.R. 204b) On cross-examination, Hooker stated that she did not have the work performed because she did not think that it was affordable and because the contractor told her that the repairs would be temporary. (Fayette S.R.R. 236b) On the second day of trial, Hooker stated again that she did not have the repair work done because she was told by the contractor that the repairs would be temporary. (Fayette S.R.R. 346b)

Defendants now allege that the trial court erred by overruling their objection because Hooker's testimony was hearsay offered in support of her claim that the home was uninhabitable. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Pa. R.E. 801(c).[7]

First, we note that Hooker did not testify at any time that the contractor informed her that the home was uninhabitable.[8]

---

7. Hearsay is not admissible unless an exception applies. Pa. R.E. 802.

8. In fact, Hooker testified that no one advised her to move out of her residence but that she

was told it was dangerous to be in the house. (Fayette S.R.R. 280b) The record is not clear as to which contractor told Hooker that the house was dangerous, whether it was the con-

She merely emphasized in her testimony that she was informed by the contractor that the repairs he would make would be temporary. (Fayette S.R.R. 204b; 236b; 346b; 357b)

Furthermore, Hooker's testimony that the contractor "told [her that the repairs would be] only temporary" was not hearsay. (Fayette S.R.R. 346b) Defendants' argument fails because in order to be hearsay, the statement must have been offered to show that the contractor's repairs would have been only temporary. A statement is inadmissible as hearsay if it is made *to prove the truth of the matter asserted.* Pa. R.E. 801(c). Yet, State Farm is alleging that Hooker's statement was made in furtherance of her position that the home was uninhabitable, not to prove that the repairs would have been temporary.

■ Assuming *arguendo* that the statement constituted hearsay, the trial court could have properly determined that the "then existing mental, emotional or physical condition" to the hearsay rule was applicable. Pa. R.E. 803(3). If offered to prove that the home was uninhabitable, the trial court could have concluded that the testimony was offered to show that Hooker believed that the damages to her home were more severe than what Defendants had suggested. As a result, Hooker's testimony was admissible.

■ Defendants further argue that the trial court erred by allowing Hooker to introduce into evidence a hypothetical estimate prepared by Defendants' expert witness, Gary Popolizio, on April 30, 2001. (Hooker Exhibit 30) In that April 30, 2001 hypothetical, Popolizio offered two estimates: the first estimate was for repairs to the common wall and the second estimate was for repairs to the common wall

as well as the basement foundation. The hypothetical estimated that the cost of replacing the entire common wall and foundation was $75,356.70. The expert reports submitted by Polopizio, however, did not rely on these estimates.

All relevant evidence is admissible. Pa. R.E. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa. R.E. 401.

Undoubtedly, Hooker was entitled to receive Popolizio's report. Pa. R.C.P. No. 4003.4. It is relevant in that it reasonably shows that in April of 2001, State Farm was made aware by its own engineering expert that the demolition caused damages to Hooker's home and that repairs were necessary.

■ Alternatively, Defendants claim that even if Popolizio's report is admissible, it was prejudicial and therefore should have been excluded by the trial court. In addition to the April 30, 2001 estimate, Popolizio also prepared a written report of the same date detailing his inspection of the premises. In that report, with regard to the basement, Popolizio noted that "[t]he basement floor showed signs of cracking and moisture influence as well." Defendants' Exhibit 4, p. 4. Popolizio concluded that

[t]he condition of the basement foundation wall that was common between the subject home and the unit that was removed (right wall) appears to have deteriorated and worsened since our June 9, 1999 site inspection. This "worsening" effect is due to ground and surface moisture coupled with soil pressures from

tractor which provided the $5,000 estimate or

any other contractors.

dry and wet conditions (hydrostatic pressure) influencing the stacked stone foundation on the subject home. It was also noted that similar worsening effects and deterioration were found in the front, back and left side foundation walls as well. . . . .

*Id.* at 6. In his recommendations, Popolizio opined that the future of the stability of the home will depend on the foundation system and that stabilization efforts would have to be undertaken. *Id.*

Moreover, the second of the two hypothetical estimates provides an approximation of the costs related to repairs to the remainder of Hooker's home, notably, repairs to the living room, dining room, kitchen, kitchen extension, and second floor front and back bedrooms. The estimates for these areas correspond with Popolizio's April 30, 2001 report identifying the damages to Hooker's home.

 The admissibility of evidence rests largely within the discretion of the trial court. *Harsh v. Petroll,* 840 A.2d 404 (Pa.Cmwlth.2003), *appeal denied,* 581 Pa. 693, 864 A.2d 531 (2004). An appellate court will only reverse the trial court's admission of evidence upon a clear showing of an abuse of discretion. *Id.* Because there was testimony that these areas also sustained damages as a result of the demolition, it was not in error for the trial court to admit into evidence Popolizio's April 30, 2001 estimates of the cost of repairs.

### Appeal of Fayette

In addition to those issues on appeal in common with State Farm, Fayette has raised a number of issues on its own. The first issue is whether the trial court erred by allowing testimony of "other wrongs" allegedly committed by Fayette at past demolition sites as evidence of negligence. Specifically, Fayette notes that prior to trial, the City sought an order of court dismissing it as a defendant in this matter. Because that motion was denied, Fayette sought to bifurcate the trial so that the issue regarding its negligence would be decided before the issue of whether the City was negligent in hiring Fayette. This request was also denied.

Before the trial court granted the City's motion for a directed verdict dismissing the City as a defendant, Norman Mason, a building inspector for the City, testified on direct examination that the City had received complaints regarding Fayette's work at other demolition sites. (Fayette S.R.R. 587b–590b) Fayette complains that the trial court erred in allowing Mason's testimony and further erred in failing to give the jury a curative instruction that Mason's testimony of other complaints against Fayette should not be considered in its deliberations on Fayette's alleged negligence in this case.

 A trial court's decision of whether to bifurcate issues at trial may not be disturbed on appeal absent an abuse of discretion. *Brian v. Brian,* 872 A.2d 843 (Pa.Super.2005). Although the trial court did not offer any basis for denying the motion to bifurcate, we note that liability may have attached against the City under Section 8542(b)(2) of what is commonly referred to as the Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8542(b)(2)(real property exception). Proof of the City's alleged negligence in hiring Fayette was dependent upon evidence presented at trial, and avoidance of duplication of such efforts is within the sound discretion of the trial court. Therefore, we cannot conclude that the trial court erred in failing to bifurcate the trial.

 We agree, however, that Fayette was entitled to a curative instruction during the jury charge that any testimony of alleged past wrongs by Fayette should not

have been considered in determining whether Fayette was negligent in the demolition of 6113 Delancey once the City was granted a directed verdict.

"The fundamental consideration in determining the admissibility of evidence is whether that evidence is relevant to the fact sought to be proved." *Starr v. Dep't of Envtl. Res.*, 147 Pa. Cmwlth. 196, 607 A.2d 321, 324 (1992). "Evidence is relevant if it tends to establish facts in issue." *Monaci v. Workmen's Compensation Appeal Board (Ward Trucking)*, 116 Pa.Cmwlth. 172, 541 A.2d 60, 62 (1988). "However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. Prejudice refers to an undue tendency to suggest a decision on an improper basis and does not refer to merely being detrimental to one party's case." *Morrison v. Dep't of Pub. Welfare, Office of Mental Heath (Woodville State Hosp.)*, 148 Pa. Cmwlth. 245, 610 A.2d 1082, 1086 (1992), *rev'd on other grounds*, 538 Pa. 122, 646 A.2d 565 (1994). Generally, remoteness of evidence is determinable by distance as well as time. *Finnerty v. Darby*, 391 Pa. 300, 138 A.2d 117 (1958).

In *Barr v. City and County of Philadelphia*, 653 A.2d 1374 (Pa.Cmwlth.1995), *rev'd on other grounds sub nom., Lory v. City of Philadelphia*, 544 Pa. 38, 674 A.2d 673 (1996), the decedent drowned in a natural body of water, locally known as Devil's Pool, located in the City's Fairmount Park. The administratrix of his estate filed suit against the City alleging negligence and willful misconduct with respect to the City's maintenance of Devil's Pool. During trial, the court of common pleas allowed the administratrix to present evidence of prior swimming pool accidents that did not occur at Devil's Pool. On appeal, we held that the court erred inasmuch as the evidence did not demonstrate circumstances and conditions similar to those at Devil's Pool when the decedent drowned.

In this case, Mason's testimony offered no time frame for receiving complaints about Fayette's demolition work nor did he offer specific instances of damages allegedly caused by Fayette.[9] (Fayette S.R.R. 587b–591) Furthermore, Mason, a City employee, was asked if he knew how many times Fayette had been sued within the two years prior to trial for negligent demolition. (*Id.* at 590b) While such testimony may be relevant to the claim that the City was negligent in hiring Fayette to perform demolition work, it was highly prejudicial on the issue of Fayette's alleged negligence in the demolition of 6113 Delancey Street causing damages to Hooker's home. Thus, we conclude that the trial court erred in failing to instruct the jury that testimony regarding other allegedly negligent conduct by Fayette was not relevant to the issue of whether Fayette was negligent in the demolition of 6113 Delancey. *See Valentine v. Acme Mkts., Inc.*, 455 Pa.Super. 256, 687 A.2d 1157 (1997)(it is well established that it cannot be proven that a person committed an act by showing that the person committed similar acts in the past; there must be some connection or relation between the prior and present acts).

Fayette further argues that the trial court erred by permitting evidence of minor damages to Hooker's home that were repaired by the City and/or Fayette. These damages include a displaced chim-

---

9. Mason testified that it was "possible" that he received complaints of water seepage after Fayette had performed other demolition work and that he received a wide range of complaints.

ney brick, a kitchen electrical receptacle that was knocked out of the wall, a wooden overhang on the front porch that was frayed, a rough-cut of the concrete front porch steps, a front porch railing that was installed upside down, and a dent in the common wall caused by a backhoe striking it. Fayette argues that testimony of these damages was improper under Pa. R.E. 408[10] and 42 Pa.C.S. § 6141.[11] We disagree.

 Pennsylvania Rule of Evidence 408 and Section 6141 of the Judicial Code are simply inapplicable to the instant matter. "The general rule is that an offer to compromise is not admissible in evidence at trial as an admission that what is offered is rightfully due or that liability exists." *Rochester Mach. Corp. v. Mulach Steel Corp.*, 498 Pa. 545, 549, 449 A.2d 1366, 1368 (1982). An offer to compromise is generally defined "as the settlement of differences by mutual concessions; an adjustment of conflicting claims." *Id.* Under such a definition, the City and/or Fayette's repair of minor damages contemporaneously with their occurrences cannot be considered *an adjustment of conflicting claims.* Taking responsibility for some items of damage while contesting

responsibility for others does not suggest that it is an offer to compromise a disputed claim. *Id.* There is no suggestion in the evidence that the repairs were undertaken as an effort to negotiate a compromise or settle any claim or potential claim made by Hooker. Therefore, the trial court did not err in permitting testimony regarding minor damages that were caused by the demolition and contemporaneously repaired.

 Fayette further maintains that the trial court erred by allowing Hooker's counsel to argue during his closing statement that the jury should draw an adverse inference against Fayette because it failed to call its owner as a witness. Hooker had requested an adverse inference instruction, which was denied by the trial court. (Fayette S.R.R. 781b; 1862b) Notwithstanding, Hooker's counsel was permitted over objection during his closing to argue that Fayette's owner, Robert Minor, did not testify even though he "had a right to take the stand in his defense, talk about his business practice, talk about what happened here." (*Id.* at 854b)

We agree with Fayette that this issue is controlled by the Supreme Court's decision

10. Rule of Evidence 408 provides:
 Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.... This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require the exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

11. Section 6141(b) and (c) provide:
 **(b) Damages to property.**—Settlement with or any payment made to a person or on his behalf to others for damages to or destruction of property shall not constitute an admission of liability by the person making the payment or on whose behalf the payment was made, unless the parties to such settlement or payment agree to the contrary.
 **(c) Admissibility in evidence.**—Except in an action in which final settlement and release has been pleaded as a complete defense, any settlement or payment referred to in [subsection ... (b)] shall not be admissible in evidence on the trial of any matter.

in *Bennett v. Sakel,* 555 Pa. 560, 725 A.2d 1195 (1999). In *Bennett,* the plaintiff brought an action against the defendant for injuries she sustained in a two-car automobile accident. During the defendant's closing argument, counsel suggested to the jury that it should draw an adverse inference against the plaintiff because she failed to call the investigating police officer and two of her physicians.

In holding that an attorney may not ask the jury to draw an adverse inference concerning the opposing party's failure to call a witness that was equally available to both parties,[12] the Court examined the decisions in *Bentivoglio v. Ralston,* 447 Pa. 24, 288 A.2d 745 (1972) and *Augustine by Augustine v. Delgado,* 332 Pa.Super. 194, 481 A.2d 319 (1984). In *Bentivoglio,* the Court found that the court of common pleas erred in instructing the jury that because the plaintiff did not call his doctors to testify, the jury could conclude that the doctors' testimonies would be unfavorable to the plaintiff. In *Augustine,* the Superior Court found that it was proper for the defense to argue that an adverse inference could be drawn from the plaintiff's failure to call two pediatric neurologists. Rather than examining whether the physicians were particularly available to plaintiffs, the Superior Court in *Augustine* focused on whether counsel's closing argument was appropriate.

In *Bennett,* the Supreme Court held that the Superior Court's interpretation of *Bentivoglio* was too narrow inasmuch as it is the *"inference itself"* that is prohibited, whether it comes from opposing counsel or the court in its instructions. *Bennett,* 555 Pa. at 563, 725 A.2d at 1196. In this case, the trial court specifically denied Hooker's request for an adverse inference instruc-

tion, yet allowed counsel to argue over objection that Minor should have testified in defense of his company's actions. Hence, we conclude that the trial court erred by failing to instruct the jury to disregard counsel's statements regarding the failure of Minor to testify.

■ Fayette next complains that the trial court erred by failing to properly instruct the jury on Fayette's duty of care owed Hooker in that the court refused to instruct the jury that Fayette's duty was limited to (1) giving notice to Hooker of the impending demolition and (2) exercising reasonable care in demolishing the adjacent building so as not to add to any damage or unstable condition which may result to her property from the removal of the adjoining residence. (Fayette's brief, p. 48; *see Sobien v. Mullin,* 783 A.2d 795 (Pa.Super.2001)). We disagree.

As previously noted, the trial court has wide discretion in phrasing jury instructions. *Gaylord.* The trial court instructed the jury on negligence as follows:

> Now, as to Fayette, since this is a negligence case, I will talk to you for a few minutes about what negligence means, what the phrase ordinary care means, and I am also going to talk about a substantial factor test which is the cause of the harm complained of.

> Negligence. Negligence ... is carelessness. It is the absence of ordinary care which a reasonable person would exercise in the circumstances presented in this case.

> . . . .

> I mentioned ordinary care.

the trial.

---

**12.** In the present action, the record indicates that Minor was in the gallery at times during

Ordinary care is the care a reasonably careful person would use under the circumstances presented in this case.

It is the duty of everyone to use ordinary care not only for one's own safety and protection but also to avoid injury or harm to the property of another.

Now, in addition to proving negligence or carelessness, [Hooker] must also prove that carelessness against Fayette was a substantial factor in causing the harm complained of.

(Fayette S.R.R. 962b–963b)

While *Sobien* is somewhat similar, we do not agree that the instruction posed in that case is necessarily controlling as to Fayette's duty of care. In *Sobien*, the "common wall" at issue was not a "party wall" as that term was legally defined.[13] The Mullin home had been constructed years before the Sobien home, and when the Sobien home was being built, it was erected right next to the Mullin home and encroached on the Mullin property. The interior framing of the Sobiens' north wall abutted Mullin's brick wall, using it as a curtain or firewall. The structural weight bearing the Sobiens' wooden beams ran from front to back and there were no ties into Mullin's structure. Thus, when Mullin demolished his three-story structure and replaced it with a two-story structure, it exposed the Sobiens' third-floor interior wall which did not have any exterior finishing material. While the Sobiens had acquired a party wall by prescriptive easement, the duty of care owed by Mullin extended only to exercising reasonable care so as not to add to the unstable condition of the exposed free standing end wall.

In the case *sub judice*, the "party wall" was a common wall literally dividing 6113 and 6115 Delancey. As part of the demolition process, the formerly common wall had to be transformed into an exterior wall and made impervious to weather conditions. Thus, the duty of care owed Hooker extended to using reasonable care in the demolition of 6113 Delancey so as not to damage the formerly common, but now exterior wall. Hence, we cannot accept Fayette's argument that the trial court erred by failing to instruct the jury that mere removal of the adjacent home, without evidence of wrongdoing, was insufficient to find Fayette liable or that Fayette cannot be held responsible for normal wear and tear resulting from the adjoining home's demolition.

Finally, Fayette maintains that the trial court erred by failing to instruct the jury on how to determine whether the property was a total loss. Fayette further argues that the trial court erred by failing to allow the use of special interrogatories. "The measure of damages for injury to property is the costs of repairs where that injury is reparable unless such cost is equal to or exceeds the value of the injured property." *Commonwealth v. United States Mineral Prods. Co.*, 809 A.2d 1000,

---

**13.** The Superior Court defined "party wall" as

a wall located upon or at the division line between adjoining landowners and used or intended to be used by both in the construction or maintenance of improvements on their respective tracts or, more briefly, as a dividing wall for the common benefit and convenience of the tenements which it separates. The term 'wall in common,' as sometimes used, has the same meaning as party wall. A distinctive feature of a party wall is that the adjacent buildings are so constructed that each derives its support from the common wall. Thus, where each of two persons is seised of a specified half of a wall and nothing more, and no right of support or shelter has been acquired by the one from the other, such a wall is not a party wall.

*Sobien*, 783 A.2d at 798 (quoting 40 Am.Jur. *Party Walls* § 2 at 485 (1942)).

1015 (Pa.Cmwlth.2002). "Where the cost of repair does exceed the value of said property, the cost of damages becomes the value of the property." *Id.*

In charging the jury, the trial court discussed damages as follows:

If you find the property was a total loss, damages are to be measured by either its market value or its special value to the plaintiff, whichever is greater.

If the property was not a total loss, damages are measured by the reasonable cost of repairs, and you may consider such evidence produced by [Fayette] by way of defense of [Hooker's] claim.

(Fayette S.R.R. 979b–980b) We find that the trial court's jury instruction regarding the measure of damages was appropriate; it accurately reflected the law and was sufficient to guide the jury in its deliberations. *Commonwealth v. Ohle,* 503 Pa. 566, 470 A.2d 61 (1983)(trial court is not required to accept the precise words of a requested point for charge as long as the charge adequately, accurately, and clearly explains the appropriate points of the law to the jury); *Gaylord.*

▮▮▮ Regarding Fayette's claim that the trial court erred by failing to allow special interrogatories to the jury regarding the calculation of damages, if any, we note that a party is not entitled to have special interrogatories submitted to the jury. *Harsh.* "The decision whether to submit special interrogatories to a jury is a ruling left to the discretion of the trial court." 840 A.2d at 440.

As the trial court recognized, the factual dispute between the parties, i.e., whether Fayette was negligent in the demolition of 6113 Delancey thereby causing damage to Hooker's residence, was not a complicated issue necessitating the use of special interrogatories to aid the jury in its determination of liability. The court further noted that the assessment of damages was likewise straightforward inasmuch as the exhibits and testimony delineated each party's position. We agree and thus cannot conclude that the trial court erred by not submitting special interrogatories to the jury on the calculation of damages.

Because we conclude that there were several errors which may have affected the outcome of the trial, we must remand the matter for a new trial. We, therefore, need not address Fayette's remaining argument that the verdict was against the weight of the evidence. Additionally, because the matter is remanded for new trial, we must vacate the trial court's orders denying Hooker's motions for additur and prejudgment interest, or in the alternative, delay damages.

Based upon the foregoing, the orders of the trial court are vacated and this matter is remanded for a new trial.

### ORDER

AND NOW, this 4th day of August, 2005, for the reasons stated in the foregoing opinion, it is hereby ordered that the March 15 and 16, 2004 orders of the Court of Common Pleas of Philadelphia County are hereby VACATED and this matter is REMANDED for a new trial.

Jurisdiction relinquished.

Judge SMITH–RIBNER concurs in the result only.